**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

<table>
<tr>
<td>

**ELMSFORD APARTMENT ASSOCIATES, LLC, 36 APARTMENT ASSOCIATES, LLC, and 66 APARTMENT ASSOCIATES, J.V.,**

**Plaintiffs,**

v.

**ANDREW CUOMO, as Governor of the State of New York**

**Defendant.**

</td>
<td>

Case No. 20-cv-04062 (CM)

</td>
</tr>
</table>

**BRIEF OF *AMICI CURIAE*
HOUSING COURT ANSWERS, MOUNT VERNON UNITED TENANTS, AND UNITED TENANTS OF ALBANY**

LEGAL SERVICES NYC
Edward Josephson, Director of Litigation
Roland Nimis, of counsel
40 Worth Street, Suite 606
New York, NY 10013
Tel: (646) 442-3600
ejosephson@lsnyc.org

THE LEGAL AID SOCIETY
Judith Goldiner, Esq., Attorney in Charge,
Civil Law Reform Unit
Ellen Davidson, of counsel
199 Water Street
New York, NY 10038
Tel: 212-577-3332
jgoldiner@legal-aid.org

*Attorneys for Housing Court Answers, Mount Vernon United Tenants, and United Tenants of Albany*

## **TABLE OF CONTENTS**

STATEMENT OF INTEREST OF AMICI CURIAE ................................................................... 1

ARGUMENT ........................................................................................................................... 2

I.      The COVID-19 Pandemic Has Created a Health and Affordability Crisis Among New
        York Tenants ................................................................................................................... 2

II.     The Resumption of Evictions for Nonpayment of Rent for Tenants Facing a Financial
        Hardship Due to COVID-19 Would Create a Homelessness Crisis .................................. 4

III.    The Housing Court System is not Capable of Adjudicating All Possible Eviction Cases
        During the Ongoing Public Health Emergency ................................................................ 6

IV.     The Executive Order is Subject to Substantial Deference ................................................. 8

V.      The Executive Order Does Not Constitute a Taking Because Plaintiffs Have Not Been
        Deprived of Any Right to Their Property. .......................................................................... 9

        A. The Executive Order does not constitute a physical taking because there is no
           compelled occupation of Plaintiffs' property. ......................................................... 10

        B. The Executive Order does not constitute a regulatory taking because Plaintiffs have
           not lost any rights or been deprived of the economic use of their property ............... 11

VI.     The Executive Order Does Not Deprive Plaintiffs of the Opportunity to Enforce Their
        Property Rights and Therefore Does Not Impinge on Any Due Process Rights. ............. 15

VII.    The Executive Order Does Not Deprive Plaintiffs of Their Contractual Rights or Access
        to a Remedy for Violations. ............................................................................................ 19

        A. The Executive Order does not substantially impair any contract .............................. 19

        B. The Executive Order is appropriately and reasonably drawn to advance a significant
           and legitimate public purpose ................................................................................... 21

CONCLUSION ...................................................................................................................... 23

## **TABLE OF AUTHORITIES**

**Cases**

*Buffalo Teachers Federation v. Tobe*,
    464 F.3d 362 (2d Cir. 2006)................................................................. 21

*Cafeteria & Restaurant Workers v. McElroy*,
    367 U.S. 886 (1961)............................................................................. 16

*Day–Brite Lighting, Inc. v. Missouri*,
    342 U.S. 421 (1952) ............................................................................ 21

*E. Enters v. Apfel*,
    524 U.S. 498 (1998) ............................................................................ 11

*Energy Reserves Group v. Kansas Power & Light Co.*,
    459 U.S. 400 (1983) ............................................................................ 21

*Exxon Corp. v. Governor of Maryland*,
    437 U.S. 117 (1978) ............................................................................ 15

*F.C.C. v. Florida Power*,
    480 U.S. 245 (1987) ...................................................................... 10, 11

*Fed. Home Loan Mortg. Corp. v. N.Y. State Div. of Hous. & Cmty. Renewal*,
    83 F.3d 45 (2d Cir. 1996) ................................................................... 10

*Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*,
    452 U.S. 264 (1981) ............................................................................ 12

*Home Building & Loan Assn. v. Blaisdell*,
    290 U.S. 398 (1934) ................................................................ 9, 19, 20, 21

*Kaiser Aetna v. United States*,
    444 U.S. 164 (1979) ............................................................................ 11

*Keystone Bituminous Coal Ass'n v. DeBenedictis*,
    480 U.S. 470 (1987) ............................................................................ 15

*Knick v. Township of Scott*,
    139 S.Ct. 2162 (2019) ......................................................................... 12

*Kraebel v. N.Y.C. Dep't of Hous. Pres. & Dev.*,
    959 F.2d 395, 403 (2d Cir. 1992).................................................. 20, 21

*Lingle v. Chevron USA Inc.*,
    544 U.S. 528 (2005) ........................................................................ 9, 11

*Lochner v. New York*,
198 U.S. 45 (1905)................................................................................................ 21

*Loretto v. Teleprompter Manhattan CATV Corp.*,
458 U.S. 419 (1982).............................................................................................. 10

*Mathews v. Eldridge*,
424 U.S. 319 (1976).......................................................................................... 16, 17

*Park Ave. Tower Assocs. v. City of New York*,
746 F.2d 135 (2d Cir. 1984)................................................................................. 13

*Penn Central Transportation Co v. New York City*,
475 U.S. 104 (1978).......................................................................................... 11, 15

*Rent Stabilization Ass'n of N.Y.C. v. Dinkins*,
5 F.3d 591 (2d Cir. 1993).................................................................................. 12, 16

*South Bay United Pentecostal Church v. Newsom*,
2020 WL 2813056 (May 29, 2020) ............................................................... 9, 16, 21

*Sveen v. Melin*,
138 S. Ct. 1815 (2018).......................................................................................... 19

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*,
535 U.S. 302 (2002)..................................................................................... 11, 13, 14

*W. 95 Hous. Corp. v. New York City Dept. of Hous. Preserv. and Dev.*,
01 CIV 1345(SHS), 2001 WL 664628, *21 (S.D.N.Y June 12, 2001)
*aff'd*, 31 Fed.Appx 19 (2d Cir. 2002) ............................................................ 12, 22

*Yee v. City of Escondido*,
503 U.S. 519 (1992).............................................................................................. 10

**Statutes**

General Obligations Law §7-108.............................................................................. 10


**Other Authorities**

*About Section 8*, New York City, https://www1.nyc.gov/site/hpd
/services-and-information/about-section-8.page (last visited June 15, 2020) ........................... 7

AO/78/20, N.Y. State Courts, https://www.nycourts.gov/whatsnew/pdf/AO-78-2020
.pdf (limiting Housing Court operations to emergencies) ......................................... 7

Cameron Huddleston, *Survey: 69% of Americans Have Less Than $1,000 in Savings*,
GOBankingRates (December 16, 2019), https://www.gobankingrates.com/saving-

money/savings
-advice/americans-have-less-than-1000-in-savings/ .................................................. 5

Cary P. Gross, *et al.*, *Racial and Ethnic Disparities in Population Level Covid-19 Mortality*,
   medRxiv (May 7, 2020), https://doi.org/10.1101/2020.05.07.20094250 .................................. 4

*City Agency Service Updates,* New York City, https://www1.nyc.gov/nyc-resources/city-agency-
   service-updates.page (last visited June 15, 2020) ...................................................... 7

*COVID-19 Dashboard by the Center for Systems Science and Engineering (CSSE) at Johns
   Hopkins University (JHU)*, https://gisanddata.maps.arcgis.com/apps/opsdashboard/index
   .html#/bda7594740fd40299423467b48e9ecf6 (last visited June 18, 2020) .............................. 3

Ctr. for Budget and Policy Priorities, *New York Federal Rental Assistance Fact Sheet* (Dec. 10,
   2019), https://www.cbpp.org/research/housing/federal-rental-assistance-fact-sheets#NY ........ 5

*Evictions*, N.Y. City Council, https://council.nyc.gov/data/evictions/ (last visited June 15, 2020)
   (not including tenants who leave their apartments voluntarily before a formal eviction) .......... 5

Fiscal Policy Inst., *Nearly Half of New York Renting Families are Rent Burdened*, (April 2019),
   Available at http://fiscalpolicy.org/wp-content/uploads/2019/04/NYS-RentBurdens
   _Apr2019_MAIN-3.pdf ........................................................................................ 5

*Guidance on Executive Order 202.6*, https://esd.ny.gov/guidance-executive-order-2026 (essential
   business definition generally excludes attorneys and building management) (last visited June
   17, 2020) ...................................................................................................... 7

*Homelessness Prevention*, New York City, https://www1.nyc.gov/site/hra/help/homebase.page
   (last visited June 17, 2020) ................................................................................ 7

Hye Jin Rho, *et al.*, *A Basic Demographic Profile of Workers in Frontline Industries*, Ctr. for
   Econ. and Policy Research (April 2020), https://cepr.net/wp-content/uploads/2020/04/2020-04
   ..................................................................................................................... 4

*Initial Claims Data - Week ending 6/06/2020*, New York State Department of Labor (June 11,
   2020), https://labor.ny.gov/stats/PDFs/Research-Notes-Initial-Claims-WE-6062020.pdf ........ 3

Michael Schwirtz and Lindsey Rogers Cook, *These N.Y.C. Neighborhoods Have the Highest
   Rates of Virus Deaths*, N.Y. Times, May 18, 2020,
   https://www.nytimes.com/2020/05/18/nyregion/coronavirus-deaths ...................................... 4

*New York Coronavirus Map and Case Count,* https://www.nytimes.com/interactive/2020/us
   /new-york-coronavirus-cases.html#county (last visited June 18, 2020) .............................. 3, 15

*New York State Division of the Budget Announces Release of the FY 2021 Enacted State Budget
   Financial Plan*, N.Y. State Div. of Budget, https://www.budget.ny.gov/pubs/press/2020/fy21-
   enacted-fp-released.html (last visited June 17, 2020) ................................................... 22

*NYS Economy Loses More than 1.7 Million Private Sector Jobs in April 2020*, N.Y. State Dep't of Labor, https://www.labor.ny.gov/pressreleases/2020/may-21-2020.shtm ........................... 15

*Preliminary Estimate of Excess Mortality During the COVID-19 Outbreak — New York City, March 11–May 2, 2020*. Centers for Disease Control and Prevention (May 15, 2020), http://dx .doi.org/10.15585/mmwr.mm6919e5external icon.................................................................... 3

Shelly Nortz, *Testimony on the Disparate Impact of COVID-19 on Homeless People in New York City before the NYS Legislature*, Coal. for the Homeless (May 18, 2020), https:// www.coalitionforthehomeless.org/wp-content/uploads/2020/05/COVID-19TestimonyMay182020.pdf............................................................................................... 6

Tamaz Cajner, *et al.*, *The U.S. Labor Market During the Beginning of the Pandemic Recession*, Nat'l Bureau of Econ. Research, https://www.nber.org/papers/w27159.pdf ............................ 4

The United States Dep't of Hous. and Urban Dev., *The 2019 Annual Homeless Assessment Report (AHAR) to Congress* (January 2020), files.hudexchange.info/resources/documents/2019 .................................................................. 6

## STATEMENT OF INTEREST OF AMICI CURIAE

*Amici curiae* are non-profit organizations that represent low-income tenants throughout the state of New York who would be at imminent risk of eviction if the governor's challenged executive order was found to be unconstitutional. *Amici* have a special interest and substantial expertise regarding evictions and low-income tenants in New York.

**Housing Court Answers ("HCA")** was founded in 1981 to provide legal information to *pro se* litigants in New York City's Housing Courts. HCA staffs tables at all of New York City's Housing Courts, providing information, answers to questions and advice to unrepresented litigants. Additionally, HCA operates a Hotline to explain housing court procedures to *pro se* litigants and to provide information about rent arrears assistance.

**Mount Vernon United Tenants ("MVUT")** is a community-based membership that has been providing tenants assistance in Westchester for over 30 years. MVUT runs a homeless prevention program that provides intensive case management to tenants at risk of homelessness. MVUT services include rent arrears assistance, landlord/tenant mediation and negotiation, assistance in filing Orders to Show Cause, and preparation of meritorious defenses in eviction proceedings.

**United Tenants of Albany ("UTA")** is a four decade old community based nonprofit organization that provides counseling and advice for Albany tenants in landlord tenant mediations and in eviction court proceedings. UTA responds to more than 5000 requests for information about housing and evictions annually. Staff responds to questions on housing law, counsels tenants and assists tenants with mediations between landlords and tenants. Staff accompanies unrepresented tenants to court proceedings.

## PRELIMINARY STATEMENT

Seemingly oblivious to the fact that New York is the epicenter of a global pandemic that has claimed the lives of 30,000 residents, Plaintiffs ask this court to second guess the emergency measures taken by the State's elected leadership to prevent the continued exponential spread of the deadliest pandemic since the 1918 influenza pandemic. Neither the Complaint nor Plaintiffs' Memorandum of Law acknowledge the potential health impact of reopening New York's Housing Courts, which annually crowd over 100,000 tenants into spaces that offer ideal breeding grounds for COVID-19. Nor do Plaintiffs make any mention of the virus's egregious death toll, the narrowly avoided collapse of New York City's health care system, the sky-rocketing unemployment rate, nor of the far-reaching State and City directives limiting every business, government and individual activity in order to prevent an even worse catastrophe. Yet Plaintiffs assert that the State's failure to exempt them from the economic sacrifice shared by 19 million other New Yorkers constitutes a violation of their constitutionally protected property rights.

As set forth below, both the Supreme Court and the Second Circuit have repeatedly held that plaintiffs may not use the Takings and Contract Clauses as a means to circumvent the legitimate policy choices of the elected branches of government – much less the choices made in the midst of a planetary emergency. *Amici* therefore urge this court to deny Plaintiffs' Motion for Summary Judgment and dismiss the complaint.

## ARGUMENT

### I.    The COVID-19 Pandemic Has Created a Health and Affordability Crisis Among New York Tenants

This case comes before the court during the ongoing coronavirus disease 2019 (COVID-19) pandemic. As of June 18, 2020, more than 8.39 million cases of COVID-19 have been reported

in 188 countries and territories, resulting in more than 450,000 deaths.[1] New York is the hardest

hit state with 30,722 deaths and New York City alone accounts for 21,645 of those deaths.[2] The

actual death toll of COVID-19 is likely even higher. COVID-19 confirmed and probable deaths

accounted for only 78% of the seasonally adjusted excess deaths through May 2, leaving 5,293

excess deaths in New York City not officially attributed to COVID-19.[3]

       In addition to the heavy death toll, COVID-19 has resulted in an unprecedented loss of

employment as non-essential businesses have shut down in-person operations to avoid spreading

the disease and to comply with New York Executive Order 202.8. Since the start of the COVID-

19 pandemic through June 6, 2.65 million unemployment claims have been filed in New York

State as compared to 190,000 that were submitted for the same period in 2019.[4] New York City

and the Hudson Valley have been hit especially hard, with unemployment claims increasing over

2019 levels by 1,477% and 1,337% respectively.[5] The staggering unemployment insurance claim

numbers do not capture the full extent of the financial hardship caused by COVID-19, because

they exclude workers who have lost work but do not qualify for unemployment, including people

without sufficient prior earnings or work history, undocumented immigrants, and those whose

hours have been cut but who still work part-time.

---

[1] *COVID-19 Dashboard by the Center for Systems Science and Engineering (CSSE) at Johns Hopkins University (JHU)*, https://gisanddata.maps.arcgis.com/apps/opsdashboard/index .html#/bda7594740fd40299423467b48e9ecf6 (last visited June 18, 2020).
[2] *New York Coronavirus Map and Case Count*, https://www.nytimes.com/interactive/2020/us /new-york-coronavirus-cases.html#county (last visited June 18, 2020).
[3] *Preliminary Estimate of Excess Mortality During the COVID-19 Outbreak — New York City, March 11–May 2, 2020*. Centers for Disease Control and Prevention (May 15, 2020), http://dx .doi.org/10.15585/mmwr.mm6919e5external icon.
[4] *Initial Claims Data - Week ending 6/06/2020*, New York State Department of Labor (June 11, 2020), https://labor.ny.gov/stats/PDFs/Research-Notes-Initial-Claims-WE-6062020.pdf.
[5] *Id.*

COVID-19's health and economic toll has disproportionately affected low-income tenants. In New York City, neighborhoods with the highest concentrations of low-income residents and Black and Latino people have suffered the highest death rates.[6] In New York State, the age-adjusted death rate for Black people is estimated to be 4.30 times the rate of White people and the mortality rate of Latinos is 3.98 times that of Whites.[7] Low-income workers have also faced higher job losses during the pandemic. In the first month of the pandemic, employment for workers in the bottom quintile dropped 35% as compared to a 9% drop in employment for the highest quintile of earners.[8] At the same time, low-income workers and people of color work disproportionately in frontline industries where they are considered essential and therefore at greater risk of being exposed to COVID-19.[9]

## II.     The Resumption of Evictions for Nonpayment of Rent for Tenants Facing a Financial Hardship Due to COVID-19 Would Create a Homelessness Crisis

The ongoing COVID-19 pandemic has fundamentally shifted the economic conditions for New York tenants. The continuing shutdown of economic activity throughout New York, which is necessary to contain the spread of COVID-19, makes it impossible for many tenants to afford rent. These exceptional circumstances make temporary limitations on evictions warranted and necessary. Despite the public health emergency and attendant financial crisis, Plaintiffs argue the Constitution proscribes temporary and tailored modifications to summary nonpayment

---

[6] Michael Schwirtz and Lindsey Rogers Cook, *These N.Y.C. Neighborhoods Have the Highest Rates of Virus Deaths*, N.Y. Times, May 18, 2020, https://www.nytimes.com/2020/05/18/nyregion/coronavirus-deaths-nyc.html.

[7] Cary P. Gross, *et al.*, *Racial and Ethnic Disparities in Population Level Covid-19 Mortality*, medRxiv (May 7, 2020), https://doi.org/10.1101/2020.05.07.20094250.

[8] Tamaz Cajner, *et al.*, *The U.S. Labor Market During the Beginning of the Pandemic Recession*, Nat'l Bureau of Econ. Research, https://www.nber.org/papers/w27159.pdf.

[9] Hye Jin Rho, *et al.*, *A Basic Demographic Profile of Workers in Frontline Industries*, Ctr. for Econ. and Policy Research (April 2020), https://cepr.net/wp-content/uploads/2020/04/2020-04-Frontline-Workers.pdf.

proceedings and security deposits. Instead, if the challenged Executive Order was struck down and evictions were allowed to continue without limitation prematurely, the consequences for tenants would be dire. A resumption of evictions would require tenants to make impossible choices between their health (and the community's health) and their homes. Thus, the modest limitations and modifications on nonpayment proceedings, evictions, and security deposits contained in Executive Order 202.28 are entirely appropriate responses to the COVID-19 emergency.

Before COVID-19, New York already had an affordability crisis for New York tenants. Forty-six percent of New York State renters are rent burdened, and four out of ten low-income people in New York are either homeless or severely rent burdened.[10] 2,034,100 New Yorkers in 940,300 low-income households pay more than 50 percent of their incomes towards their rents.[11] Black, Latinx, and Asian households were disproportionately rent burdened before the pandemic.[12] Most low-income tenants do not earn enough to have any significant savings.[13] Many of these tenants fall behind; in New York City in 2017, 230,000 eviction petitions were filed and more than 20,000 families were formally evicted by a city marshal.[14] Some tenants are able to find alternative housing, but many are not. New York State has the highest per capita rate of people who are

---

[10] Ctr. for Budget and Policy Priorities, *New York Federal Rental Assistance Fact Sheet* (Dec. 10, 2019), https://www.cbpp.org/research/housing/federal-rental-assistance-fact-sheets#NY.
[11] *Id.*
[12] Fiscal Policy Inst., *Nearly Half of New York Renting Families are Rent Burdened*, (April 2019), Available at http://fiscalpolicy.org/wp-content/uploads/2019/04/NYS-RentBurdens_Apr2019_MAIN-3.pdf
[13] Cameron Huddleston, *Survey: 69% of Americans Have Less Than $1,000 in Savings*, GOBankingRates (December 16, 2019), https://www.gobankingrates.com/saving-money/savings-advice/americans-have-less-than-1000-in-savings/
[14] *Evictions*, N.Y. City Council, https://council.nyc.gov/data/evictions/ (last visited June 15, 2020) (not including tenants who leave their apartments voluntarily before a formal eviction).

homeless. In January 2019, there were 92,091 people in homeless shelters or part of the count of unsheltered homeless.[15]

Given the base level instability of housing in New York and the COVID-19-induced economic suppression, New York tenants would face mass evictions if nonpayment proceedings and evictions were allowed to resume without limitation. If evictions resumed, tenants would be forced to risk their health and risk further spread of COVID-19 by returning prematurely to work. The current combination of unemployment benefits and an eviction moratorium allows low-income tenants to focus on following public health mandates without fearing they will fall into homelessness. If tenants are forced to double-up with relatives, enter the shelter system, or sleep on the street, more people will die and the virus will continue to spread.[16]

### III.   The Housing Court System is not Capable of Adjudicating All Possible Eviction Cases During the Ongoing Public Health Emergency

*Amici* contend that there should be a complete moratorium on evictions during the COVID-19 pandemic. However, if Housing Court operations do reopen and evictions proceed as contemplated by the challenged order, allowing nonpayment cases against COVID-19-impacted tenants would be unwise and unjust. Throughout the state, Housing Courts, attorney offices, building management offices, code enforcement agencies, and other actors who are generally involved in eviction litigation have been physically closed during the pandemic and have had

---

[15] The United States Dep't of Hous. and Urban Dev., *The 2019 Annual Homeless Assessment Report (AHAR) to Congress* (January 2020), files.hudexchange.info/resources/documents/2019-AHAR-Part-1.pdf

[16] *See* Shelly Nortz, *Testimony on the Disparate Impact of COVID-19 on Homeless People in New York City before the NYS Legislature*, Coal. for the Homeless (May 18, 2020), https://www.coalitionforthehomeless.org/wp-content/uploads/2020/05/COVID-19TestimonyMay182020.pdf (age-adjusted mortality rate of homeless residents in NYC shelters is 56% higher than rate for other New York City residents).

limited operations.[17] The COVID-19 pandemic has also put extreme stress on New York institutions that low-income tenants rely on to maintain economic and housing stability. Like many businesses, government departments throughout the state, including local departments of Social Services, have had to close their physical offices and set up limited remote services.[18] The New York City Human Resources Administration, for instance, has closed almost all local Job Centers where tenants could previously go to open cases for public assistance, emergency rental assistance, SNAP benefits, and rent subsidies. Likewise, public housing authorities, which administer Section 8 benefits, and Homebase operators, which connect tenants to social services and rental assistance, have been physically closed to the public since March.[19]

    As the courts begin to slowly resume operations, there will continue to be a backlog of unresolved cases and limitations on the processing of new cases. Due to social distancing requirements, Housing Courts will not be able to operate in-person in the near term and will instead schedule virtual court appearances and accept most papers through a new e-filing system created in response to the pandemic. Housing Court case files generally only exist in hard copy and the Housing Courts are not yet physically open to the public. Thus, courts and litigants will not have access to court records required to resolve cases. Because many low-income tenants involved in

---

[17] *See* AO/78/20, N.Y. State Courts, https://www.nycourts.gov/whatsnew/pdf/AO-78-2020
.pdf (limiting Housing Court operations to emergencies); *Guidance on Executive Order 202.6*,
https://esd.ny.gov/guidance-executive-order-2026 (essential business definition generally
excludes attorneys and building management) (last visited June 17, 2020); *City Agency Service
Updates,* New York City, https://www1.nyc.gov/nyc-resources/city-agency-service-updates.page
(last visited June 15, 2020) (code inspections in NYC limited to heat, hot water, and other dire
conditions).
[18] *See City Agency Services Updates*, *supra* note 17.
[19] *Homelessness Prevention*, New York City, https://www1.nyc.gov/site/hra/help/homebase.page
(last visited June 17, 2020); *About Section 8*, New York City, https://www1.nyc.gov/site/hpd
/services-and-information/about-section-8.page (last visited June 15, 2020).

the Housing Court system lack access to technology, the court system and associated organizations will need to create systems that are accessible without creating further public health risks.

While commencing virtual operations with these limitations, Housing Courts will necessarily focus on the subset of cases that are judicable. Nonpayment proceedings against tenants who are facing financial hardship due to COVID-19 are the least amenable to resolution in the coming months. Many tenants will be unrepresented by counsel and will not have the technical capability to appear or file papers virtually. In order to adjudicate these cases, public housing authorities will need to be subpoenaed to resolve disputes about Section 8 voucher payments, code enforcement agencies will need to inspect apartments for housing conditions and place violations, building management offices will need to process income recertifications, access dates for apartment repairs will need to be scheduled, tenants will need to be connected to legal services organizations, attorneys will need to obtain affidavits from their clients in support of motions, social services departments and community based organizations will need to assess tenants for eligibility for rental assistance and subsidies, and courts will need to hold hearings on the extent of rent-impairing conditions. All the involved entities will be operating in a limited capacity in accordance with public health limitations. When any of the components required to litigate and resolve a nonpayment proceeding does not function due to COVID-19-related limitations, it will create delays and waste judicial resources. Thus, if court operations should proceed at all, New York's exclusion of a limited set of nonpayment proceedings against COVID-19-impacted tenants is warranted by the current health crisis.

### IV.    The Executive Order is Subject to Substantial Deference

In the context of this unprecedented public health and economic crisis, the Governor issued an order delaying plaintiffs' ability to evict tenants and allows tenants to use their security deposits

toward rent. All constitutional claims related to this order must be evaluated in light of these extraordinary times. Recognizing the dangers of interfering with orders issued in response to COVID-19, the Supreme Court recently explained:

> Our constitution principally entrusts the safety and the people to the politically accountable officials of the States to guard and protect. When those officials undertake to act in areas fraught with medical and scientific uncertainties, their latitude must be especially broad. Where those broad limits are not exceeded, they should not be subject to second-guessing by an unelected federal judiciary which lacks the background, competence, and expertise to assess public health and is not accountable to the people.

*South Bay United Pentecostal Church v. Newsom*, 2020 WL 2813056 (May 29, 2020). This affirms the longstanding principle that the State has inherent police power to protect the "lives, health, morals, comfort and general welfare of the people." *Home Building & Loan Assn. v. Blaisdell*, 290 U.S. 398, 437 (1934).

### V.   The Executive Order Does Not Constitute a Taking Because Plaintiffs Have Not Been Deprived of Any Right to Their Property.

In the context of this unprecedented public health and economic crisis, the Governor issued an order delaying plaintiffs' ability to evict tenants. Plaintiffs complain that this executive order of limited duration, deprives them of their property interests and their due process rights. It does not. Furthermore, the Supreme Court clearly instructs that whether government action "substantially advanced legitimate state interests" is "an inquiry in the nature of a due process, not a takings, test," with "no proper place in our takings jurisprudence." Courts must "defer to legislative judgments about the need for, and likely effectiveness of, regulatory actions." *Lingle v. Chevron USA Inc.*, 544 U.S. 528, 544-45 (2005). As such, Plaintiffs' physical and regulatory takings claims fail.

**A. The Executive Order does not constitute a physical taking because there is no compelled occupation of Plaintiffs' property.**

Plaintiff alleges that the Executive Order prohibits Plaintiffs from asserting their contractual and statutory rights, creating an actual, state-sponsored occupancy. Pl.'s Mem. at 14. However, *compelled* physical occupation is a necessary element to any takings claim. As the Supreme Court and Second Circuit have repeatedly held, landlords *invite* physical occupation. Regulating the terms of tenancies invited by property owners does not compel physical occupation. *Yee v. City of Escondido*, 503 U.S. 519, 529 (1992). The Supreme Court "has consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particularly without paying compensation for all economic injuries that such regulation entails" *Yee*, 503 U.S. at 528-29 quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 440 (1982); *see also Fed. Home Loan Mortg. Corp. v. N.Y. State Div. of Hous. & Cmty. Renewal*, 83 F.3d 45, 48 (2d Cir. 1996) ("The law does not subject the property to a use which its owner neither planned nor desired. Rather, it regulates the terms under which the owner may use the property as previously planned." (cleaned up))

In *Yee*, the plaintiffs challenged a rule requiring mobile home park owners to allow purchasers of tenants' mobile homes to stay on the prior owners' leases. 503 U.S. at 523–24. The owners argued the rule "amount[ed] to compelled physical occupation because it deprive[d] petitioners of the ability to choose their incoming tenants." *Id.* at 530–31. The Supreme Court disagreed. Because the owners had "voluntarily open[ed] their property to occupation by others," they could not "assert a per se right to compensation based on their inability to exclude particular individuals." *Id.* "A different case would be presented were the statute, on its face or as applied, to compel a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy" (*Id.* at 528 citing *F.C.C. v. Florida Power*, 480 U.S. 245, 251-252 (1987). Statutes

merely regulating economic relations of landlords and tenants are not per se takings and are properly analyzed under the regulatory taking framework. *Florida Power*, 480 U.S. at 252.

Here, the Executive Order does not impose any physical occupation on landlords. Instead, it temporarily regulates the existing landlord-tenant relationship into which property owners voluntarily entered. The Order does not vitiate contractual or statutory claims for rent or damages. Property owners will be permitted to seek all rent due and owed throughout the moratorium as soon as it is over. If a tenancy ends and the security deposit has not yet been replenished, owners still have the right to seek damages in court. For these reasons, Plaintiffs' physical taking claim must fail.

### B. The Executive Order does not constitute a regulatory taking because Plaintiffs have not lost any rights or been deprived of the economic use of their property.

To determine if regulation has an economic impact that reaches the level of a taking depends on whether "justice and fairness require that economic injuries caused by public action be compensated by the government." *Kaiser Aetna v. United States*, 444 U.S. 164, 175 (1979). The inquiry is "essentially ad hoc and fact intensive" based on three factors of particular significance: the economic impact of the regulation, its interference with reasonable investment backed expectations, and the character of the governmental action. *E. Enters v. Apfel*, 524 U.S. 498, 523-24 (1998) citing *Penn Central Transportation Co v. New York City*, 475 U.S. 104 (1978).

As a threshold matter, broadly applicable regulations are not susceptible to facial regulatory takings challenges. In a facial challenge, "the narrow inquiry before the Court . . . [is] whether the mere enactment of the regulations constituted a taking." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 318 (2002). For regulatory takings, the question is whether the law, on its face, is "functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Lingle* , 544 U.S. at 539. It

"must be conducted with respect to specific property, and the particular estimates of economic impact and ultimate valuation relevant in the unique circumstances." *Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 295 (1981). "Whether a taking has occurred depends . . . on a variety of financial and other information unique to each landlord." *Rent Stabilization Ass'n of N.Y.C. v. Dinkins*, 5 F.3d 591, 597 (2d Cir. 1993). The Executive Order applies to every landlord in the state of New York. A single facial challenge to each landlord's unique circumstances cannot survive. *W. 95 Hous. Corp. v. New York City Dept. of Hous. Preserv. and Dev.*, 01 CIV 1345(SHS), 2001 WL 664628, *21 (S.D.N.Y June 12, 2001) *aff'd*, 31 Fed.Appx 19 (2d Cir. 2002).

Plaintiffs summarily claim that the Executive Order has significant economic impact, interfering with legitimate economic expectations and property interests thereby constituting a taking. Pl.'s Mem. at 14. According to Plaintiffs, the availability of summary nonpayment proceedings after August 19, 2020 is of no consequence. Plaintiffs rely on *Knick v. Township of Scott*, 139 S.Ct. 2162 (2019) for this proposition: "If a local government takes private property without paying for it, that government has violated the Fifth Amendment…without regard to subsequent state court proceedings." However, Plaintiffs leap over the actual regulatory takings analysis to come to this conclusion.

In *Knick*, a property owner with a small family graveyard challenged an ordinance requiring all cemeteries to be open to the public as a taking of her property. *Knick,* 139 S.Ct. at 2168. The district court dismissed the claim because she had not pursued an inverse condemnation action in state court to obtain compensation for the value of property. *Id.* at 2169. The Supreme Court found in favor of the property owner, overturning precedent that required property owners to seek just compensation in state court before a federal takings claim would be ripe. *Id.* at 2172. As such, contrary to Plaintiff's implication, *Knick* merely stands for the proposition that the Fifth

Amendment is self-executing at the time of the taking and the property owner may proceed directly to federal court. It does not mean that delaying enforcement of existing rights constitutes taking. That analysis must take place within the *Penn Central* framework.

Furthermore, the *Penn Central* analysis must focus on the "parcel as a whole" encompassing both the "geographic dimensions" and the "temporal aspects of the owner's interests." *Tahoe-Sierra*, 535 U.S. at 331. As such, any regulatory taking claim cannot rely exclusively on the owner's interests in the property during the time period covered by the Executive Order.

### i. Economic Effect

Plaintiffs summarily allege that the Executive order deprives each of them of the full value of their property "in that the threat to a complete rental stream decreases the value thereof..." Compl. ¶ 51. Plaintiffs provide no facts to analyze the particular economic effect of the Executive Order. There are multiple approaches to property valuation and while rental income is a factor among many of them, it is rarely the sole determinant. A temporary reduction in collection is unlikely to impact a property's long-term value. Even assuming some diminution in earnings or value, it is not a taking:"[a] permanent deprivation of the owner's use of the entire area is a taking of the parcel as a whole, whereas a temporary restriction that merely causes a diminution in value is not" *Tahoe-Sierra*, 535 U.S. at 332, internal quotations omitted; *see also Park Ave. Tower Assocs. v. City of New York*, 746 F.2d 135, 138 (2d Cir. 1984) ("the inability of [owners] to receive a reasonable return on their investment by itself does not, as a matter of law, amount to an unconstitutional taking.") Indeed, "A fee simple estate cannot be rendered valueless by a temporary prohibition on economic use, because the property will recover value as soon as the

prohibition is lifted." *Tahoe-Sierra*, 535 U.S. at 332. Here, there is no bar to Plaintiffs' economic use.

Plaintiffs failed to articulate any but speculative economic harm. However, based on the data above, it is improbable that every landlord has sufficient defaults in rent payments that a delay in their ability to evict a tenant causes a constitutionally significant economic harm. Therefore, at most, the Executive order is a temporary restriction on maximizing economic use where the owner retains all claims to rent and all future interests and core property rights.

### ii.  Investment-Backed Expectations

The Executive Order has not plausibly interfered with Plaintiffs' investment-backed expectations. Landlord-tenant relationships are heavily regulated in New York and have undergone significant changes in just the past year with the enactment of the Housing Stability and Tenant Protection Act of 2019. Such change in response to societal needs should have formed part of any property owner's reasonable expectations.

Additionally, the Executive Order does not deprive property owners of any claims for rent and enforcement of these claims must still be adjudicated. Therefore, there is no change to the method or the resources necessary to collect rent from tenants who have failed to pay.

Even if expectations were reasonable, investments inevitably differed among landlords. The Executive Order has not plausibly impinged on every landlord's reasonable, investment-backed expectations, and certainly not to a constitutionally significant degree.

### iii.  Character of the Government Action

The Executive Order was issued in response to an unprecedented public health and economic crisis. As of June 10, 2020, over three hundred and eighty thousand New Yorkers have

tested positive for COVID-19 and more than thirty thousand of them have died.[20] On May 21, 2020, The New York State Department of Labor announced that New York's seasonally adjusted unemployment rate increased from 4.1% to 14.5%, the largest recorded increase since data collection started in 1976.[21] The Executive Order was issued in part to prevent the spread of COVID-19 by forcing an increasing number of New Yorkers into homeless shelters or other congregate housing situations.

The Executive Order represents a "public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Cent.*, 438 U.S. at 124. The magnitude of the State's interest in light of the COVID-19 pandemic cannot be overstated. Weighed against Plaintiff's generalized assertion of economic harm, temporary restrictions or modifications to the means to enforce their rights are reasonable. Plaintiffs have not lost the right to enforce any of their contractual or statutory rights stemming from their landlord-tenant relationships. The State's measures forestall a threat to the common welfare and Plaintiffs have no basis to claim that they cannot profitably engage in their business. *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470 (1987). Therefore, Plaintiffs' regulatory taking claim must fail.

**VI.  The Executive Order Does Not Deprive Plaintiffs of the Opportunity to Enforce Their Property Rights and Therefore Does Not Impinge on Any Due Process Rights.**

Plaintiffs' challenge to the Executive Order on due process grounds is improper: "The evidence presented by the [landlords] may cast some doubt on the wisdom of the statute, but it is, by now, absolutely clear that the Due Process Clause does not empower the judiciary to sit as a superlegislature to weigh the wisdom of legislation." *Exxon Corp. v. Governor of Maryland*, 437

---

[20] *New York Coronavirus Map and Case Count*, *supra* note 2.
[21]  *NYS Economy Loses More than 1.7 Million Private Sector Jobs in April 2020*, N.Y. State Dep't of Labor, https://www.labor.ny.gov/pressreleases/2020/may-21-2020.shtm.

U.S. 117, 124 (1978). Executive action is also afforded "especially broad" latitude when responding to a public health crisis. *South Bay*, 2020 WL 2813056 at *1.

To the extent that Plaintiffs raise substantive due process claims, similar to claims regarding rent regulation, this Court should find that a facial challenge is unsustainable because "determination in a particular case that a landlord has been arbitrarily deprived of this property interest in a constitutionally adequate return will depend on the same individualized economic and financial data on which the takings analysis would depend." *Dinkins*, 5 F.3d at 597. "Viewing a regulation that 'goes too far' as an invalid exercise of the police power, rather than as a 'taking' for which just compensation must be paid, does not resolve the difficult problem of how to define 'too far,'" and that determination requires tailored analysis of the same individualized factors. *Id.* at 597–98.

As to Plaintiffs' procedural due process claim, they assert that the Executive Order "precludes Plaintiffs from being heard at *any* time, let alone at a meaningful time or manner." Pl.'s Mem. at 6. To support his proposition Plaintiffs cite to *Mathews v. Eldridge*, a case that challenged administrative procedures terminating social security benefits: "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." 424 U.S. 319, 335 (1976).

Contrary to Plaintiffs' implication, being heard in a meaningful time and manner does not mean that Plaintiffs must have the right to be heard as soon as any claim arises. The *Mathews* Court additionally explained that due process "is not a technical conception with a fixed content unrelated to time, place, and circumstances." *Mathews*, 424 U.S. at 334 (quoting *Cafeteria & Restaurant Workers v. McElroy,* 367 U.S. 886, 895 (1961)). It is "flexible and calls for such procedural protections as the particular situation demands." *Id.* (internal quotations omitted). Such

16

analysis relies on a threefold inquiry requiring consideration of "the private interest that will be affected by the official action"; "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute safeguards"; and lastly "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id*. at 335.

Plaintiffs assert that both prongs of the Executive Order removed Plaintiffs' rights without any opportunity to be heard. As it relates to the security deposit provisions, Plaintiffs cannot ignore that they accrue an immediate economic benefit when a security deposit is used to pay rent. At most, this use is a temporary trade in interests and not an outright deprivation. Furthermore, no landlord has a per se right to a security deposit. General Obligations Law §7-108 allows landlords to keep all or a portion of a security deposit after the landlord specifies their claims in writing but the tenant retains the right to challenge these claims in court. Additionally, for any claim in excess of the available security deposit, owners can still bring an action for additional damages against the tenant. There is no risk to erroneous deprivation in these circumstances.

The State's interest here is twofold: it responds to requests from landlords across the State to allow the use of security deposits for back rent to help stabilize rental income and to keep tenants stably housed during the pandemic. Any additional fiscal or administrative burdens caused by the order are minimal. Landlords are merely permitted to collect their unpaid rent from the deposit immediately instead of waiting until the end of the tenancy. Where there were additional damages subject to collection in a security deposit, landlords would have had to commence a proceeding to collect these additional sums anyway.

Plaintiffs additionally claim that the Executive Order "precludes the Plaintiffs from commencing any action against their residential tenants based upon non-payment of rent until at

least August." Pl.'s Mem. at 6. This is false. Petitioner acknowledges that the language of the order only restricts landlords from commencing or enforcing a nonpayment eviction proceeding against a tenant is eligible for unemployment benefits or benefits under state or federal law or otherwise facing financial hardship due to COVID-19. Pl.'s Mem. at 6. This creates a partial moratorium, not a complete bar. Plaintiffs cannot credibly claim that they will never be able to ascertain whether a tenant qualifies for protection under the moratorium. They merely have to satisfy some level of due diligence prior to commencement. Plaintiffs acknowledge that The New York State Office of Court Administration has already issued directives for the required showing. Guterman Decl. ¶¶ 6-8.[22]

To the extent that the Executive Order changes the enforcement of any claims, it is clear that Plaintiffs reserve all rights to unpaid rents from tenants that fall under the scope of the order. Their private interests are only affected inasmuch as enforcement is delayed by a few months. There is no risk that the Order risks an erroneous deprivation of their claims for rent. If they are entitled to rent now, they will still be entitled to rent on August 20th. Allowing all cases to proceed directly to Court is contrary to the State's interest in continued social distancing to mitigate the ongoing public health crisis. Any additional burdens to proceed with claims during the moratorium are well within the scope of longstanding procedures required to bring claims, namely drafting affidavits based on personal knowledge.

For these reasons, Plaintiffs' due process claims must fail.

---

[22] Should the Governor issue a more robust moratorium on the commencement and enforcement of eviction proceedings, which the *amici* believe is necessary to respond to the unprecedented crisis facing New York State, it would also survive these constitutional challenges.

**VII.    The Executive Order Does Not Deprive Plaintiffs of Their Contractual Rights or Access to a Remedy for Violations.**

The Contracts Clause provides that "[n]o state shall...pass any...law impairing the Obligation of Contracts." U.S. Const., Art I, § 10, cl. 1. This means that no state may "adopt as its policy the repudiation of debts or the destruction of contracts or denial of means to enforce them." *Blaisdell,* 290 U.S. at 439.

Claims based on the Contract clause are subject to a two-step test. As a threshold issue, the Court must first determine whether the state law has operated as a substantial impairment of a contractual relationship by considering the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights. If there is a substantial impairment, the second step of the test is to determine whether the state law is drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose." *Sveen v. Melin*, 138 S. Ct. 1815, 1822 (2018).

**A.    The Executive Order does not substantially impair any contract**

Plaintiffs allege that the Executive order impaired their lease rights by allowing tenants to use their security deposits toward rent without the consent of the landlord. Plaintiff's claim that "the security deposit is the only known source of funds fr[o]m which a landlord can recoup the costs of repairs and unpaid rent from its tenants." Pl.'s Mem. at 15. This is patently untrue. Landlords are not limited to the value of a security deposit to recoup the cost of repairs and unpaid rents at the end of a tenancy. They may bring an action for any excess in small claims, civil, or supreme court depending on the value of the claim.

Furthermore, the Executive Order requires the tenant to begin replenishing the security deposit within 90 days of it being used to pay rent. Depending on the particular circumstances of

19

each tenancy and the individual rate of repayment, the owner will have access to more immediate funds to compensate for property damage or unpaid rents at the end of the tenancy.

As to the eviction moratorium, Plaintiffs allege that the Executive Order impairs their "implied contract right to use the Court system to assert their rights as against tenants who fail to pay their rent."  Pl.'s Mem. at 15-16. As discussed above, this is a mischaracterization of the order. There is no absolute bar.

In *Blaisdell*, The Supreme Court upheld the Minnesota Mortgage Moratorium Law enacted in response to a declared state of emergency now known as the Great Depression. The moratorium law authorized courts to extend the periods of redemption from foreclosure sale as the court deemed just and equitable for up to two years.  The act would expire with the state of emergency or on May 1, 1935, whichever was earlier. *Blaisdell,* 290 U.S. at 416.

Similarly, neither provision of the Executive Order deprives Plaintiffs of claims arising from the contractual bargain; at most enforcement is delayed. No claims are lost or diminished in any way. As repeatedly demonstrated, landlord-tenant law is heavily regulated and "reservation of the reasonable exercise of the protective power of the state is read into all contracts" *Id.* at 444; *see also Kraebel v. N.Y.C. Dep't of Hous. Pres. & Dev.*, 959 F.2d 395, 403 (2d Cir. 1992) (Plaintiffs are "involved in a heavily-regulated industry—rental of residential property in New York City—and cannot claim surprise that [their] relationships with certain tenants are affected by governmental action."). There is nothing in the Executive order that would prevent plaintiffs from safeguarding or reinstating their rights when the order expires. For these reasons, there is no substantial impairment of Plaintiffs' contracts.

**B.      The Executive Order is appropriately and reasonably drawn to advance a significant and legitimate public purpose**

Plaintiffs' Contract Clause claim fails even if the Executive Order did substantially impair existing contracts because it delays but does not vitiate any of Plaintiffs' rights while protecting tenants and the public by keeping New Yorkers socially distanced in their homes during a global pandemic. The Supreme Court has long recognized that there is no violation of the Contracts Clause where a government action "directly preventing the immediate and literal enforcement of contractual obligations by a temporary and conditional restraint, where vital public interests would otherwise suffer." *Blaisdell,* 290 U.S. at 440.

Under the Contracts Clause, "as is customary in reviewing economic and social regulation, courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *Energy Reserves Group v. Kansas Power & Light Co.*, 459 U.S. 400, 412–13 (1983) (cleaned up). In *Buffalo Teachers*, the Second Circuit held that Supreme Court precedent does not require courts to reexamine all of the factors underlying the legislation at issue and to make a de novo determination whether another alternative would have constituted a better statutory solution to a given problem. *Buffalo Teachers Federation v. Tobe*, 464 F.3d 362, 370 (2d Cir. 2006). Nor is the heightened scrutiny to be applied as exacting as that commonly understood as strict scrutiny. Such a high level of judicial scrutiny of the legislature's actions would harken a dangerous return to the days of *Lochner v. New York*, 198 U.S. 45 (1905), overruled, see *Day–Brite Lighting, Inc. v. Missouri,* 342 U.S. 421 (1952), in which courts would act as superlegislatures, overturning laws as unconstitutional when they "believe[d] the legislature [ ] acted unwisely," In times of crisis, the Executive actions are accorded similar deference. *South Bay,* 2020 WL 2813056.

Courts thus regularly dismiss Contract Clause claims when the government's purpose is facially legitimate. *See, e.g.*, *Kraebel*, 959 F.2d at 403 (affirming dismissal of Contract Clause

21

claim because, among other reasons, "there is a legitimate state purpose" for the challenged law exempting senior citizens from rent increases); *W. 95 Hous. Corp.*, 2001 WL 664628 at *9 (dismissing Contract Clause claim against RSL because it "was enacted for a legitimate state purpose," namely, "preventing exactions of unjust, unreasonable and oppressive rents").

Here, New York State is facing unprecedented economic and public health crises. The Executive Order balances any temporary limitations on the exercise of Plaintiffs' rights with the extraordinary needs of the public during this time. Plaintiffs assert that New York "is fully capable of providing monetary relief to those tenants who are ultimately unable to pay on-going rent, either through direct payments to landlords, or by additional grants to tenants." Pl.'s Mem. at 13. This argument, however, fails to take into account the full contours of the economic crisis.

On April 25, 2020, the New York State Division of Budget announced the Fiscal Year 2021 Enacted State Budget Financial Plan, which projected a $13.3 billion shortfall in revenues forecast for the year prior the COVID-19 pandemic. As a consequence, the Financial Plan reduced spending by $10.1 billion from the Executive Budget.[23] Robert Mujica, the New York State Budget Director stated that "in the absence of federal assistance, [New York] will have to make deep cuts which could impact a broad range of services."

In the interim, New York State has also created the New York Forward Loan Fund to support small businesses, nonprofits, and small landlords that have seen loss of rental income. The program is targeted to owners with residential buildings of 50 units or less and prioritizes loans for landlords whose properties are in low- and moderate-income census tracts or who serve low to moderate income tenants.

---

[23] *New York State Division of the Budget Announces Release of the FY 2021 Enacted State Budget Financial Plan*, N.Y. State Div. of Budget, https://www.budget.ny.gov/pubs/press/2020/fy21-enacted-fp-released.html (last visited June 17, 2020).

The Executive Order is appropriately and reasonably drawn to advance a significant and legitimate public purpose. No rights are lost. The use of security deposits for rent does not deprive the owner the ability to collect additional damages later and indeed provides interim financial security to the landlord. The delay in commencing or enforcing nonpayment proceedings is well within the two year moratorium authorized in *Blaisdell*. And in light of the more extensive scheme to protect housing during the pandemic, it is rational for New York State to issue a moratorium on evictions while it determines what funds will be available to assist tenants experiencing financial hardship due to COVID-19 and how to disburse those funds.

For these reasons, Plaintiffs' contract clause claims must fail.

## CONCLUSION

*Amici* respectfully submit that Plaintiffs' motion for summary judgment should be denied and that this case should be dismissed.

Respectfully submitted,

LEGAL SERVICES NYC
Edward Josephson, Director of Litigation
Roland Nimis, of counsel
40 Worth Street, Suite 606
New York, NY 10013
Tel: (718) 237-5538
ejosephson@lsnyc.org

THE LEGAL AID SOCIETY
Judith Goldiner, Esq., Attorney in Charge,
Civil Law Reform Unit
Ellen Davidson, of counsel
199 Water Street
New York, NY 10038
Tel: 212-577-3332
jgoldiner@legal-aid.org