UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ELMSFORD APARTMENT ASSOCIATES, LLC, 36
APARTMENT ASSOCIATES, LLC, and 66 APARTMENT
ASSOCIATES, J.V.,

                              Plaintiffs,

            v.

ANDREW CUOMO, as Governor of the State of New York,

                              Defendant.

No. 20-cv-4062 (CM)

**GOVERNOR ANDREW M. CUOMO'S MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF HIS
CROSS-MOTION FOR SUMMARY JUDGMENT**

LETITIA JAMES
Attorney General
State of New York
*Attorney for Governor Andrew M. Cuomo*
28 Liberty Street
New York, NY 10005
(212) 416-8610

Matthew L. Conrad
Assistant Attorney General
*Of Counsel*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................ 1

STATEMENT OF FACTS ................................................................................................ 2

    A.    The COVID-19 Pandemic and Economic Crisis .......................................... 2

    B.    Executive Order 202.28 ................................................................................ 4

STANDARD OF REVIEW ............................................................................................... 7

ARGUMENT ................................................................................................................... 8

**I.**    **EO 202.28 DOES NOT CONSTITUTE EITHER A PHYSICAL OR A REGULATORY TAKING.............................................................................8**

    A.    EO 202.28 Does Not Cause a Physical Taking........................................... 9

    B.    EO 202.28 Does Not Effect a Regulatory Taking ..................................... 10

**II.**    **EO 202.28 DOES NOT VIOLATE THE CONTRACT CLAUSE ....................................14**

    A.    The Contract Clause Does Not Override the Police Power of the States .................. 15

    B.    Plaintiffs Do Not Satisfy Any Elements of a Violation of the Contract Clause ......... 16

        1.    Plaintiffs' Contract Rights Have Not Been Substantially Impaired ........................ 16

        2.    EO 202.28 Serves a Significant Public Purpose ....................................... 17

        3.    The Means Utilized by EO 202.28 Are Reasonable and Appropriate..................... 19

**III.**    **EO 202.28 DOES NOT VIOLATE PLAINTIFFS' DUE PROCESS RIGHTS.............21**

**IV.**    **PLAINTIFFS' STATE LAW CLAIMS ARE BARRED BY ELEVENTH AMENDMENT IMMUNITY ...............................................................24**

CONCLUSION................................................................................................................ 25

## TABLE OF AUTHORITIES

CASES                                                                                          Page(s)

1256 Hertel Ave. Associates, LLC v. Calloway
   761 F.3d 252 (2d Cir. 2014)..............................................................................8, 11

Ambrose v. City of White Plains,
   2018 WL 1635498 (S.D.N.Y. Apr. 2, 2018)...........................................................15

Anderson v. Liberty Lobby, Inc.,
   477 U.S. 242 (1986)...............................................................................................7

Ass'n of Surrogates & Sup. Ct. Rep'rs v. State of N.Y.,
   940 F.2d 766 (2d Cir. 1991)...................................................................................15

Brontel, Ltd. v. City of N.Y.,
   571 F. Supp. 1065 (S.D.N.Y. 1983).......................................................................16

Buffalo Teachers Fed. v. Tobe,
   464 F.3d 362 (2d Cir. 2006)....................................................................9, 10, 11, 15

Celotex Corp. v. Catrett,
   477 U.S. 317 (1986)...............................................................................................7

CFCU Cmty. Credit Union v. Hayward,
   552 F.3d 253 (2d Cir. 2009)...................................................................................15

Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.,
   508 U.S. 602 (1993)..........................................................................................11, 14

Cranley v. Nat'l Life Ins. Co. of Vt.,
   318 F.3d 105 (2d Cir. 2003)....................................................................................7

Energy Reserves Group, Inc. v. Kan. Power and Light Co.,
   459 U.S. 400 (1983)..............................................................................................19

Fed. Deposit Ins. Corp. v. Mallen,
   486 U.S. 230 (1988)..............................................................................................24

Fed. Home Loan Mtge. Corp. v. N.Y.S. Div. of Hous. & Cmty. Renewal,
   83 F.3d 45 (2d Cir. 1996) ................................................................................10, 23

Fernandes v. Moran,
   2018 WL 2103206 (E.D.N.Y. May 7, 2018) ...........................................................8

Gizzo v. Ben-Habib,
  44 F. Supp. 3d 374 (S.D.N.Y. 2014) .................................................................22

Harmon v. Markus,
  412 F. App'x 420 (2d Cir. 2011) ...............................................................10, 22

Jado Assocs., LLC v. Suffolk Cnty. Sewer Dist. No. 4-Smithtown Galleria,
  2014 WL 2944086 (E.D.N.Y. June 30, 2014) ...................................................12

Kabrovski v. City of Rochester,
  149 F. Supp. 3d 413 (W.D.N.Y. 2015) .......................................................12, 14

Kargman v. Sullivan,
  582 F.2d 131 (1st Cir. 1978) ............................................................................16

Kelly v. N.Y. Civil Service Comm'n,
  632 F. App'x 17 (2d Cir. 2016) .........................................................................25

Kelo v. City of New London, Connecticut,
  545 U.S. 469 (2005) ...........................................................................................8

Lingle v. Chevron U.S.A. Inc.,
  544 U.S. 528 (2005) ...........................................................................9, 11, 13, 14

Marcus Brown Holding Co. v. Feldman,
  256 U.S. 170 (1921) (Holmes, J.) .....................................................................16

Meriden Tr. & Safe Deposit Co. v. F.D.I.C.,
  62 F.3d 449 (2d Cir. 1995) ...............................................................................11

Murr v. Wisconsin,
  137 S. Ct. 1933 (2017) ................................................................................11, 12

Palazzolo v. Rhode Island,
  533 U.S. 606 (2001) ...........................................................................................9

Park Ave. Tower Assocs. v. City of N.Y.,
  746 F.2d 135 (2d Cir. 1984) .............................................................................23

Penn. Cent. Transp. Co. v. City of N.Y.,
  438 U.S. 104 (1978) ....................................................................................11, 14

Pennhurst State Sch. & Hosp. v. Halderman,
  465 U.S. 89 (1984) ...........................................................................................25

Rent Stabilization Ass'n of City of N.Y. v. Dinkins,
  5 F.3d 591 (2d Cir. 1993) ...................................................................................8

Rent Stabilization Ass'n v. Dinkins,
  805 F. Supp. 159 (S.D.N.Y. 1992)........................................................................23

Ruston v. Town Bd. for Skaneateles,
  610 F.3d 55 (2d Cir. 2010)................................................................................8

S. Lyme Prop. Owners Ass'n., Inc. v. Town of Old Lyme,
  539 F. Supp. 2d 524 (D. Conn. 2008).................................................................8

Sanitation and Recycling Indus. v. City of New York,
  107 F.3d 985 (2d Cir. 1997)..........................................................15, 16, 17, 19

Seminole Tribe of Florida v. Florida,
  517 U.S. 44 (1996).........................................................................................25

Singer v. City of N.Y.,
  417 F. Supp. 3d 297 (S.D.N.Y. 2019)...............................................................14

Southview Assocs., Ltd. v. Bongartz,
  980 F.2d 84 (2d Cir. 1992)................................................................................9

Sykes v. N.Y. State Office of Children & Family Svcs.,
  2019 WL 4688608 (S.D.N.Y. Sept. 25, 2019).....................................................7

Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,
  535 U.S. 302 (2002).......................................................................................12

Treistman v. McGinty,
  804 F. App'x 98 (2d Cir. 2020) .......................................................................25

Troy Ltd. v. Renna,
  727 F.2d 287 (3d Cir. 1984)............................................................................16

United States v. Salerno,
  481 U.S. 739 (1987)..........................................................................................7

W. 95 Hous. Corp. v. New York City Dep't of Hous. Pres. & Dev.,
  31 F. App'x 19 (2d Cir. 2002) ...................................................................10, 12

Wellswood Columbia, LLC v. Town of Hebron,
  2013 WL 356619 (D. Conn. Jan. 29, 2013).......................................................22

Yee v. City of Escondido, Cal.,
  503 U.S. 519 (1992)...............................................................................9, 10, 12

## CONSTITUTIONAL PROVISIONS

U.S. Const., art. I, § 10.............................................................................14, 15

U.S. Const., amend. V .............................................................................................8, 9, 22

U.S. Const., amend. XI ...........................................................................................24, 25

U.S. Const., amend. XIV ...........................................................................................8, 21

**STATE STATUTES**

N.Y. General Obligations Law ........................................................................................5

N.Y. Executive Law.................................................................................................4, 24

**FEDERAL STATUTES**

15 U.S.C. § 9058 (Coronavirus Aid, Relief, and Economic Security Act) ................................4, 5

**STATE REGULATIONS**

3 N.Y.C.R.R. § 119.1 ..................................................................................................21

**RULES**

Fed. R. Civ. P. 56......................................................................................................1, 7

Fed. R. Civ. P. 56.1 .....................................................................................................1

Fed. R. Civ. P. 65 .......................................................................................................1

Defendant Andrew M. Cuomo, sued in his official capacity as Governor of the State of New York ("Governor Cuomo" or "Governor"), respectfully submits this memorandum of law in opposition to the motion for summary judgment (ECF No. 7)[1] filed by Plaintiffs Elmsford Apartment Associates, LLC, 36 Apartment Associates, LLC, and 66 Apartment Associates, J.V. (collectively, "Plaintiffs") and in support of the Governor's cross-motion for summary judgment pursuant to Fed. R. Civ. P. 56. For the reasons set out below, Plaintiffs' motion for summary judgment must be denied, and the Governor's cross-motion for summary judgment dismissing the complaint in its entirety should be granted.

## PRELIMINARY STATEMENT

Together with the rest of the world, the State of New York is currently facing a public health and economic challenge of historic proportions. The COVID-19 pandemic has caused tens of thousands of deaths in New York State, an enormous number that nevertheless could have been far higher had the State not taken urgent action to halt the spread of the virus by mandating temporary restrictions on businesses and social gatherings. Thanks to these measures, the State is now emerging from the peak of the health crisis. However, the pandemic has also had an unavoidable negative economic impact, resulting in countless layoffs, furloughs, and salary cuts, as well as the highest nationwide unemployment rate since the Great Depression. These economic challenges will likely continue to persist during and after the State's recovery from the pandemic.

Among the many measures intended to protect the people of New York from both the

---

[1] Plaintiffs' motion is styled as a motion for a temporary restraining order and preliminary injunction under Fed. R. Civ. P. 65. During the telephonic status conference held on June 5, 2020, the parties agreed that that this case presents purely legal questions, and the Court converted Plaintiffs' motion to one seeking summary judgment on their claim for a permanent injunction under Fed. R. Civ. P. 56. See Docket Minute Entry dated June 5, 2020. Plaintiffs have not filed a Rule 56.1 Statement, and, as such, Governor Cuomo has filed neither a Rule 56.1 Counterstatement nor a Rule 56.1 Statement in support of the cross-motion for summary judgment.

health dangers and the economic fallout of the pandemic were a series of executive orders issued by Governor Cuomo to prevent people and businesses from being evicted during the pandemic. One such measure was Executive Order 202.28, issued by Governor Cuomo on May 7, 2020. This order, <u>inter alia</u>, temporarily halted evictions of residential and commercial tenants who had been financially harmed by the pandemic, as well as foreclosures on property, through August 19, 2020. It also permitted tenants to elect to direct security deposits towards rent, with the stipulation that a security deposit used for this purpose must be replenished in monthly installments.

Plaintiffs, a group of residential landlords in Westchester County, now ask this Court to declare two provisions of Executive Order 202.28 unconstitutional and to permanently enjoin their effect, so that they may commence eviction proceedings now, instead of waiting two months until August 20, 2020. The requested injunction would have the result of immediately putting an untold number of renters and owners at risk of losing their homes and businesses, at precisely the time when certainty and security are needed to support the recovery of New York's economy and prevent a recurrence of the worst depths of the pandemic.

As demonstrated below, all of Plaintiffs' claims against Executive Order 202.28 fail as a matter of law. It is neither a government taking nor a violation of the Contracts Clause (see Points I and II, <u>infra</u>), and it does not burden any due process right of Plaintiffs or of any other landlord (see Point III, <u>infra</u>). Rather, it is a common-sense, narrowly tailored measure that does not deprive Plaintiffs of any rights to their property.  Accordingly, this Court should uphold Executive Order 202.28 as a valid and constitutional exercise of Governor Cuomo's emergency executive power.

## **STATEMENT OF FACTS**

### A.   **The COVID-19 Pandemic and Economic Crisis**

The backdrop of this case is the ongoing COVID-19 pandemic that has, to date, caused tens of thousands of deaths in New York State, and hundreds of thousands of deaths worldwide.

New York was, for much of the past several months, the global epicenter of the pandemic.[2] Thanks to the lifesaving efforts of medical professionals, essential workers, state and local governments, and ordinary New Yorkers who have heeded calls to shelter-in-place and practice social distancing, New York's daily death toll has been reduced from a peak of approximately 800 per day to less than 50 per day and declining.[3] The threat is not over, however, as thousands of New Yorkers remain hospitalized,[4] and continued vigilance will be necessary to prevent a deadly second wave of the pandemic from afflicting the State.

A concomitant effect of the COVID-19 pandemic and the efforts required to stem it have been an accompanying economic crisis. Public places where the virus could spread have been unable to operate as normal, shuttering restaurants, bars, shops, sporting venues, arts venues, and numerous other types of businesses.[5] The result has been an unemployment crisis of historic proportions. Nationally, the unemployment rate rose from 3.8% in February 2020 to 14.4% in April and 13.0% in May.[6] New York State has faced a similar increase, with unemployment reaching approximately 13% in April.[7]

This devastating unemployment crisis is threatening to metastasize into an eviction and

---

[2] See New York Times, New York City Region Is Now an Epicenter of the Coronavirus Pandemic (March 22, 2020), https://www.nytimes.com/2020/03/22/nyregion/Coronavirus-new-York-epicenter.html.

[3] See New York, Covid Tracking Project, https://covidtracking.com/data/state/new-york#historical.

[4] See Id.

[5] https://coronavirus.health.ny.gov/new-york-state-pause

[6] Pew Research Center, Unemployment rose higher in three months of COVID-19 than it did in two years of the Great Recession (June 11, 2020), https://www.pewresearch.org/fact-tank/2020/06/11/unemployment-rose-higher-in-three-months-of-covid-19-than-it-did-in-two-years-of-the-great-recession/.

[7] Forbes, New York State Unemployment Rate Is At Highest Level Since The Great Depression, (Apr. 26, 2020), https://www.forbes.com/sites/mayrarodriguezvalladares/2020/04/26/new-york-state-unemployment-rate-is-at-highest-level-since-the-great-depression/.

homelessness crisis among the numerous New Yorkers who cannot pay their rents or mortgages as the result of temporarily or permanently losing their jobs. As of yet, many renters and mortgage holders have been able to continue to make payments as a result of enhanced unemployment benefits, but the future of these federal benefits programs is uncertain.[8] The result may be a torrent of rent shortfalls beginning once these benefits expire and lasting until a substantial proportion of renters regain their jobs.[9] This danger falls disproportionately on low-income and minority households who have lost jobs at a greater rate than other demographic segments.[10]

**B.    Executive Order 202.28**

On March 2, 2020, in response to the initial spread of COVID-19, the New York State Legislature passed Senate Bill S7919, which <u>inter alia</u> amended the New York Executive Law to establish an enumerated list of disaster events in which the Governor would be empowered to suspend statutes or regulations and/or issue directives, including the occurrence of an "epidemic" or "disease outbreak."[11] As the COVID-19 pandemic struck New York, Governor Cuomo utilized this legislatively granted authority to issue the COVID-19 Executive Orders, a series of initiatives to fight the spread of the virus through minimizing in-person contact between New Yorkers. As

---

[8] <u>E.g.</u> Politico, <u>McConnell vows end to enhanced unemployment benefits</u> (May 20, 2020), https://www.politico.com/news/2020/05/20/mcconnell-unemployment-benefits-271661; New York Times, <u>With Jobless Benefits Set to Lapse, Congress Is at Odds over an Extension</u> (June 11, 2020), https://www.nytimes.com/2020/06/11/us/politics/unemployment-benefits-coronavirus.html.

[9] <u>See</u> NYU Furman Center, <u>Understanding the Potential Magnitude of Rent Shortfalls in New York Due to COVID</u> (June 4, 2020), https://furmancenter.org/thestoop/entry/understanding-the-potential-magnitude-of-rent-shortfalls-in-new-york-state ("[W]e project need in August, the period when the most beneficial CARES Act provision for UI claiming households wears off, assuming little or no job recovery.").

[10] <u>See</u> <u>id.</u> ("A disproportionate share of the workers at risk of housing instability and nonpayment are Black and Hispanic, as evidenced by their over-representation in occupations that have faced higher rates of job loss.").

[11] <u>See</u> Senate Bill S7919, available at https://www.nysenate.gov/legislation/bills/2019/s7919.

circumstances change and new information becomes available, Governor Cuomo has issued new orders or modified existing Executive Orders to ensure that New York's response to the pandemic remains carefully calibrated to the situation as it exists.

On March 20, 2020, Governor Cuomo issued Executive Order 202.8, which directed that "[t]here shall be no enforcement of either an eviction of any tenant residential or commercial, or a foreclosure of any residential or commercial property for a period of ninety days."[12]

On May 7, 2020, Governor Cuomo issued Executive Order 202.28 ("EO 202.28"), which, in part, provides as follows:

- Sections 7-103, 7-107 and 7-108 of the General Obligations Law [are modified] to the extent necessary to provide that:

  o Landlords and tenants or licensees of residential properties may, upon the consent of the tenant or licensee, enter into a written agreement by which the security deposit and any interest accrued thereof, shall be used to pay rent that is in arrears or will become due. If the amount of the deposit represents less than a full month rent payment, this consent does not constitute a waiver of the remaining rent due and owing for that month. Execution in counterpart by email will constitute sufficient execution for consent;

  o Landlords shall provide such relief to tenants or licensees who so request it that are eligible for unemployment insurance or benefits under state or federal law or are otherwise facing financial hardship due to the COVID-19 pandemic;

  o It shall be at the tenant or licensee's option to enter into such an agreement and landlords shall not harass, threaten or engage in any harmful act to compel such agreement;

  o Any security deposit used as a payment of rent shall be replenished by the tenant or licensee, to be paid at the rate of 1/12 the amount used as rent per month. The payments to replenish the security deposit shall become due and

---

[12] This directive was followed by limited federal protection from eviction, as well. On March 27, 2020, the federal government enacted the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"). Among the CARES Act's provisions was a prohibition against new eviction cases filed by housing providers who participate in certain federal housing rental programs on the basis of non-payment of rent. See 15 U.S.C. § 9058.

owing no less than 90 days from the date of the usage of the security deposit as rent. The tenant or licensee may, at their sole option, retain insurance that provides relief for the landlord in lieu of the monthly security deposit replenishment, which the landlord, must accept such insurance as replenishment.

. . . .

- There shall be no initiation of a proceeding or enforcement of either an eviction of any residential or commercial tenant, for nonpayment of rent or a foreclosure of any residential or commercial mortgage, for nonpayment of such mortgage, owned or rented by someone that is eligible for unemployment insurance or benefits under state or federal law or otherwise facing financial hardship due to the COVID-19 pandemic for a period of sixty days beginning on June 20, 2020.

EO 202.28. These excerpts include the provisions of EO 202.28 challenged in this action, which accomplish two substantive effects: (1) they effectively impose a moratorium on commencing eviction proceedings, until August 20, 2020, against any renter who is eligible for unemployment insurance or benefits or who otherwise faces financial hardship caused by the COVID-19 pandemic; and (2) they permit any such renter to direct their security deposit towards current or past-due rent payments, on the condition that, starting no more than 90 days after the use of the deposit for this purpose, the renter will begin to replenish the deposit in monthly installments.

Upon the issuance of EO 202.28, Governor Cuomo explained that "during these incredibly difficult and stressful times we must protect New Yorkers who are facing financial hardships due to COVID-19 . . . . The majority of people in the state live paycheck to paycheck, and all of a sudden the paychecks have stopped for these individuals but the rent bill keeps coming in. In March we issued a moratorium on all residential and commercial evictions, and we are going to extend that moratorium until August 20th to provide some relief to those New Yorkers who are struggling."[13]

---

[13] https://www.governor.ny.gov/news/amid-ongoing-covid-19-pandemic-governor-cuomo-announces-moratorium-covid-related-evictions-will

On June 6, 2020, after the commencement of this action, Governor Cuomo issued Executive Order 202.38, which renewed Executive Order 202.28 for an additional 30 days, without modifying the eviction moratorium's end date of August 19, 2020.

## STANDARD OF REVIEW

As this Court is aware, a party is entitled to summary judgment when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A "material fact" is one that might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "genuine" only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. To defeat summary judgment, the non-moving party must establish more than the "mere existence of a scintilla of evidence" in support of his position. Id. at 252. One cannot avert summary judgment with conclusory statements, conjecture, or speculation or by resting on the allegations in his pleadings, but rather the non-moving party must present competent evidence from which a reasonable jury could reasonably find in his favor. Id. at 248.

Here, Plaintiffs' claims are in the nature of a facial challenge to EO 202.28. "A plaintiff making a facial claim faces an uphill battle because it is difficult to demonstrate that mere enactment of a piece of legislation violates the plaintiff's constitutional rights." Cranley v. Nat'l Life Ins. Co. of Vt., 318 F.3d 105, 110 (2d Cir. 2003) (citation omitted). As the Supreme Court has held, a facial challenge "is . . . the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." United States v. Salerno, 481 U.S. 739, 745 (1987). This test "remains the basis for evaluating facial constitutional challenges in the Second Circuit." Sykes v. N.Y. State Office of Children &

<u>Family Svcs.</u>, No. 1:18-cv-8309, 2019 WL 4688608, at *14, n.14 (S.D.N.Y. Sept. 25, 2019). Courts routinely apply that standard in cases asserting facial challenges under the Fifth Amendment takings clause. <u>See</u> <u>Rent Stabilization Ass'n of City of N.Y. v. Dinkins</u>, 5 F.3d 591, 595 (2d Cir. 1993) (reiterating <u>Salerno</u> test and holding that the complaint did not state a facial challenge under Takings Clause). <u>See also</u> <u>Ruston v. Town Bd. for Skaneateles</u>, 610 F.3d 55, 58, n.2 (2d Cir. 2010) (zoning law); <u>S. Lyme Prop. Owners Ass'n., Inc. v. Town of Old Lyme</u>, 539 F. Supp. 2d 524, 535 (D. Conn. 2008).

In this case, neither party disputes any of the material facts, and agrees that this case raises only legal questions and that judgment as a matter of law is appropriate.

## <u>ARGUMENT</u>

### I.  EO 202.28 DOES NOT CONSTITUTE EITHER A PHYSICAL OR A REGULATORY TAKING

Plaintiffs are not entitled to summary judgment on their claim that EO 202.28 constitutes a taking in violation of the Fifth Amendment of the United States Constitution, and summary judgment should be granted in favor of Governor Cuomo.

The Fifth Amendment's Takings Clause, which is applicable to the states through the Fourteenth Amendment (<u>see</u> <u>Kelo v. City of New London, Connecticut</u>, 545 U.S. 469, 472 n.1, (2005)) provides that no "private property [shall] be taken for public use, without just compensation," and is "designed to bar [the] Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." <u>Fernandes v. Moran</u>, No. 2:17-cv-03430, 2018 WL 2103206, at *8 (E.D.N.Y. May 7, 2018) (quoting <u>Penn. Cent. Transp. Co. v. City of N.Y.</u>, 438 U.S. 104, 123-24 (1978)). "The Supreme Court has recognized two branches of Takings Clause cases: physical takings and regulatory takings." <u>1256 Hertel Ave. Associates, LLC v. Calloway</u> 761 F.3d 252, 263 (2d Cir. 2014).

Plaintiffs' allegations do not satisfy either branch and fail as a matter of law. There was inarguably no physical taking, and the limited impact of EO 202.28 and the critical government interest involved both establish that there was no regulatory taking.

### A.     EO 202.28 Does Not Cause a Physical Taking

 "The paradigmatic taking requiring just compensation," known as a physical taking, "is a direct government appropriation or physical invasion of private property." Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 537 (2005). See also Palazzolo v. Rhode Island, 533 U.S. 606, 617 (2001) ("The clearest sort of taking occurs when the government encroaches upon or occupies private land for its own proposed use."). A physical taking "occur[s] when the government physically takes possession of an interest in property for some public purpose," Buffalo Teachers Fed. v. Tobe, 464 F.3d 362, 374 (2d Cir. 2006). But "the government effects a physical taking only where it requires the landowner to submit to the physical occupation of his land." Yee v. City of Escondido, Cal., 503 U.S. 519, 527 (1992). Accord Southview Assocs., Ltd. v. Bongartz, 980 F.2d 84, 94 (2d Cir. 1992). Government action that does not entail a physical occupation, but merely affects the use and value of private property, does not result in a physical taking of property.

The closest comparison to the present case is the context of New York's rent stabilization laws, which limit the rent increases that housing owners may charge tenants in regulated apartments and restricts the circumstances in which tenants may be evicted. Those laws and others like them have repeatedly withstood legal challenge under the Fifth Amendment Takings Clause. For example, in Yee v. City of Escondido, mobile home park owners challenged a municipal rent control ordinance and a California statute that "limit[ed] the bases upon which a park owner may terminate a mobile home owner's tenancy." Yee, 503 U.S. at 524. They argued that this regime of mobile home regulations effected a physical taking because "what has been transferred from park

owner to mobile home owner is no less than a right of physical occupation of the park owner's land." Id. at 527. The Supreme Court rejected the park owners' argument, holding that it "cannot be squared with our cases on physical takings," which occur only when the government "requires the landowner to submit to the physical occupation of his land." Id. The local rent controls and state law at issue in Yee "authorize[d] no such thing." To the contrary, the park owners "voluntarily rented their land to mobile home owners . . . . Put bluntly, no government has required any physical invasion of petitioners' property. Petitioners' tenants were invited by petitioners, not forced upon them by the government." Id. at 528. The Second Circuit, in evaluating New York's rent control laws, has agreed, holding that these laws "regulate[] land use rather than effecting a physical occupation." W. 95 Hous. Corp. v. New York City Dep't of Hous. Pres. & Dev., 31 F. App'x 19, 21 (2d Cir. 2002); see also Harmon v. Markus, 412 F. App'x 420, 422 (2d Cir. 2011) (affirming dismissal of physical takings claim on the ground that the rent stabilization law "does not effect permanent physical occupation of the [owners'] property").

The Supreme Court and Second Circuit precedent make very clear that EO 202.28 does not effect a physical taking. Plaintiffs have voluntarily leased their apartments to tenants, and "where a property owner offers property for rental housing, the Supreme Court has held that government regulation of the rental relationship does not constitute a physical taking." Fed. Home Loan Mtge. Corp. v. N.Y.S. Div. of Hous. & Cmty. Renewal, 83 F.3d 45, 47-48 (2d Cir. 1996) (citing Yee, 503 U.S. at 529); cf. Buffalo Teachers Fed., 464 F.3d at 374 ("The fact of a taking is fairly obvious in physical takings cases.").

### B.     EO 202.28 Does Not Effect a Regulatory Taking

Where an alleged interference with property rights "arises from a public program adjusting the benefits and burdens of economic life to promote the public good," Buffalo Teachers Fed., 464

10

F.3d at 374, the question is whether a regulatory taking has occurred. A regulatory taking does not

entail a physical occupation, but, rather, occurs when "governmental regulation of private property

'goes too far' and is 'tantamount to a direct appropriation or ouster.'" 1256 Hertel Ave. Assocs.,

761 F.3d at 263 (quoting Lingle, 544 U.S. at 537). In determining whether a regulatory taking

occurred, courts "must remain cognizant that government regulation – by definition – involves the

adjustment of rights for the public good, and that [g]overnment hardly could go on if to some

extent values incident to property could not be diminished without paying for every such change

in the general law." Lingle, 544 U.S. at 538-39 (citations and internal quotation marks omitted).

"Mere diminution in the value of property, however serious, is insufficient to demonstrate a

taking." Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal., 508

U.S. 602, 645 (1993) (citing cases where 75% and 92.5% diminution in value was held insufficient

to establish a taking).

Plaintiffs bear a "heavy burden" in attempting to plead and prove that a governmental

action effects a regulatory taking. Buffalo Teachers Fed'n, 464 F.3d at 375 (citing Keystone

Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 493 (1987)). To determine whether a

regulatory taking has occurred, courts "engage in essentially ad hoc, factual inquiries to determine

in each case whether the challenged property restriction rises to the level of a taking." Id. (citation

omitted); see also Murr v. Wisconsin, 137 S. Ct. 1933, 1942 (2017). "Paramount to the inquiry are

the familiar factors set forth" by the Supreme Court in Penn Central. 1256 Hertel Ave. Assocs.,

761 F.3d at 264, citing Penn Central, 438 U.S. at 124. Those factors include "the character of the

governmental action, its economic impact, and its interference with reasonable investment-backed

expectations." Meriden Tr. & Safe Deposit Co. v. F.D.I.C., 62 F.3d 449, 454 (2d Cir. 1995)

(citations omitted). As this is a fact-specific inquiry "designed to allow careful examination and

weighing of all the relevant circumstances," Murr, 137 S. Ct. at 1937, thread-bare factual allegations of harm, such as those offered by Plaintiffs, do not satisfy the Penn Central inquiry. A specific, detailed showing of how and to what extent a plaintiff is harmed is required to plead and prove that a regulatory taking has occurred. See, e.g., Kabrovski v. City of Rochester, 149 F. Supp. 3d 413, 424-25 (W.D.N.Y. 2015) (holding that economic impact alleged in "vague and conclusory terms," such as alleging "reduced business and lost revenues," does not satisfy Penn Central).

Moreover the Second Circuit has observed that regulatory takings claims are not susceptible to facial challenges, such as Plaintiffs'. A regulatory taking claim "necessarily entails complex factual assessments of the purposes and economic effects of government actions." Yee, 503 U.S. at 523. Noting this fact-intensive analysis, the Second Circuit held in the context of rent stabilization laws that "the difficulty of such an assessment suggests that a widely applicable rent control . . . is not susceptible to facial constitutional analysis under the Takings Clause." W. 95 Hous. Corp., 31 F. App'x at 20. See also Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302 (2002) (holding that per se rules did not apply to regulatory taking claims, which must be decided by a fact-intensive application of the factors set forth in Penn Central).

Applying the Penn Central factors here, it is clear that Plaintiffs have not demonstrated that EO 202.28 effects a regulatory taking. First, by any measure, the character of the government action here weighs strongly against any possible regulatory taking claim. The question is whether the challenged government action "amounts to a physical invasion or instead merely affects property interests through some public program adjusting benefits and burdens of economic life to promote the common good." Jado Assocs., LLC v. Suffolk Cnty. Sewer Dist. No. 4-Smithtown Galleria, No. CV-12-3011, 2014 WL 2944086, at *6 (E.D.N.Y. June 30, 2014) (quoting Lingle, 544 U.S. at 538-39). As explained above, temporarily suspending evictions and permitting security

deposits to be credited to rent do not amount to a physical occupation of property, but are permissible governmental directives temporarily adjusting economic relations between owners and tenants.

Second, Plaintiffs have failed to demonstrate the kind or degree of economic impacts necessary to support a regulatory taking claim. The Complaint does not allege that EO 202.28 deprives Plaintiffs of all or nearly all of their properties' economic value. In fact, Plaintiffs have neither alleged nor introduced any facts regarding whether any of their tenants have stopped paying rent as a result of EO 202.28, much less that any tenants have done so despite the ability to pay. And even if some of Plaintiffs' tenants were unable to pay rent during the effective period of EO 202.28, the executive order does not nullify or cancel these rent obligations; it merely temporarily prevents Plaintiffs from evicting the tenants. Plaintiffs may, if they desire, still attempt to collect any arrears from their tenants or negotiate a resolution. Any economic impact on Plaintiffs is temporary and minimal, and well within the permissible "adjustment of rights for the public good" that does not constitute a regulatory taking. Lingle, 544 U.S. at 538. Nor does the temporary ability to credit security deposits to rent payments cause any economic impact sufficient to allege a regulatory taking. The most that Plaintiffs allege in this regard is that "[e]ach of the Plaintiffs has had [at] least one tenant that has directed that the tenant's security deposit be applied to rent arrears owed by that tenant," Compl. ¶ 30, while notably failing to even suggest that they have as of yet been negatively impacted by this. Nor could they, because EO 202.28 requires the prompt replenishment of security deposits used to pay rent arrears. Plaintiffs complain that it may take time to obtain a judgment in a situation where a tenancy has ended before a deposit has been replenished, but, in doing so, they acknowledge that there is an available process to protect their interests and that they can eventually recover any losses caused by the redirection of security

deposits. <u>See</u> Declaration of Stephen J. Lehrman ¶¶ 17-18, ECF No. 9.

     <u>Third</u>, Plaintiffs make no allegations that EO 202.28 has interfered with distinct investment-backed expectations, as is required by the <u>Penn Central</u> test. <u>See</u> <u>Lingle</u>, 544 U.S. at 538-39, <u>citing</u> <u>Penn Central</u>, 438 U.S. at 124. Specifically, Plaintiffs do not allege that EO 202.28 will prevent them from realizing a financial return on their rental property, or that the value of their property will be reduced to the point of "interference." Nor could they plausibly do so, as the directives of EO 202.28 are by definition <u>temporary</u>; Plaintiffs will have the legal ability to recoup any unpaid back rent after the eviction moratorium ends, and security deposits credited towards rent will be replenished. In any event, "mere diminution in the value of property, however serious, is insufficient to demonstrate a taking." <u>Concrete Pipe & Prods</u>, 508 U.S. at 645.

     In sum, an analysis of the <u>Penn Central</u> factors make clear that Plaintiffs have failed to state, much less prove, a regulatory taking claim. <u>See</u> <u>Singer v. City of N.Y.</u>, 417 F. Supp. 3d 297, 327 (S.D.N.Y. 2019) (rejecting takings argument where "Plaintiffs do no more than assert, in entirely conclusory fashion," that the challenged action "would constitute a taking under applicable law."); <u>Kabrovski</u>, 149 F. Supp. 3d at 424-25 (granting motion to dismiss takings clause claim where "the Complaint does not indicate the economic impact that the Defendants' actions have had on the Plaintiff, except in vague and conclusory terms").

## II.    EO 202.28 DOES NOT VIOLATE THE CONTRACT CLAUSE

     Plaintiffs also allege that EO 202.28 violates the Contract Clause of the U.S. Constitution (U.S. Const., art. I, § 10, cl. 1.). <u>See</u> Pl. Mem. p.15, ECF No. 10. However, it is well-established that government regulation of rental agreements, including in the closely analogous context of rent stabilization, is a permissible exercise of the State's police power and does not violate the Contract Clause, even where such regulation overrides the terms of leases entered into before the effective date of the government action. "Although the language of the Contract Clause is facially absolute,

its prohibition must be accommodated to the inherent police power of the State 'to safeguard the vital interests of its people.'" CFCU Cmty. Credit Union v. Hayward, 552 F.3d 253, 266 (2d Cir. 2009), citing Energy Reserves Group, Inc. v. Kan. Power and Light Co., 459 U.S. 400, 410 (1983).

### A.    The Contract Clause Does Not Override the Police Power of the States

The Contract Clause provides that "No State shall . . . pass any . . . Law impairing the Obligation of Contracts[.]" U.S. Const., art. I, § 10, cl. 1. The Contract Clause "does not trump the police power of a state to protect the general welfare of its citizens, a power which is 'paramount to any rights under contracts between individuals.'" Buffalo Teachers Fed'n, 464 F.3d at 367-68 (quoting Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 240 (1978)). "Rather, courts must accommodate the Contract Clause with the inherent police power of the state 'to safeguard the vital interests of its people.'" Id. (quoting Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 434 (1934)). "Thus, state laws that impair an obligation under a contract do not necessarily give rise to a viable Contracts Clause claim[.]" Id.

Moreover, "in reviewing economic and social regulation" under the Contract Clause, "courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." Ass'n of Surrogates & Sup. Ct. Rep'rs v. State of N.Y., 940 F.2d 766, 771 (2d Cir. 1991) (citations omitted). In this Circuit, courts apply a three-part inquiry to determine whether a statute is valid exercise of the police power or, conversely, a Contract Clause violation. This test asks "(1) whether the contractual impairment is in fact substantial; if so, (2) whether the law serves a significant public purpose, such as remedying a general social or economic problem; and, if such a public purpose is demonstrated, (3) whether the means chosen to accomplish this purpose are reasonable and appropriate." Sanitation and Recycling Indus. v. City of New York, 107 F.3d 985, 993 (2d Cir. 1997). See also Ambrose v. City of White Plains, No. 10-CV-4946, 2018 WL

1635498, at *11 (S.D.N.Y. Apr. 2, 2018), aff'd, 779 F. App'x 765 (2d Cir. 2019).

Specifically, in the context of rent stabilization laws that provide the closest comparison to the directives at issue here, courts have routinely rejected challenges to rent regulations under the Contract Clause, holding that the public interest in rent regulations outweighs any purported intrusion on the parties' contractual rights and duties. In a leading case on the subject, a property owner challenged legislation enacted to protect tenants by extending their lease terms. Marcus Brown Holding Co. v. Feldman, 256 U.S. 170, 198 (1921) (Holmes, J.). The Supreme Court affirmed the dismissal of the claim, holding that "contracts are made subject to this exercise of the power of the State when otherwise justified, as we have held this to be." Id. See also David P. Currie, The Constitution in the Supreme Court: 1910-1921, 1985 Duke L.J. 1111, 1162, n.103 (1985) (explaining that Marcus Brown Holding "permitted rent control legislation to override an existing contract on the ground that the contract clause had not been mean[t] to interfere with the police power"). It is "well established that [New York] City's rent control laws do not unconstitutionally impair contract rights." Brontel, Ltd. v. City of N.Y., 571 F. Supp. 1065, 1072 (S.D.N.Y. 1983) (citing Marcus Brown Holding, 256 U.S. at 198; Israel v. City Rent & Rehab. Admin. of N.Y., 285 F. Supp. 908 (S.D.N.Y. 1968); Tonwal Realties, Inc. v. Beame, 406 F. Supp. 363, 365 (S.D.N.Y. 1976)), aff'd, 742 F.2d 1439 (2d Cir. 1984). Accord Troy Ltd. v. Renna, 727 F.2d 287, 299 (3d Cir. 1984); Kargman v. Sullivan, 582 F.2d 131, 132 (1st Cir. 1978).

### B.  Plaintiffs Do Not Satisfy Any Elements of a Violation of the Contract Clause

Plaintiffs fail to allege or prove any of the factors for determining whether a government action constitutes a violation of the Contract Clause.

#### 1.  Plaintiffs' Contract Rights Have Not Been Substantially Impaired

Plaintiffs have not alleged (and cannot allege) a "substantial" impairment of their contract rights. Sanitation and Recycling Indus., 107 F.3d at 993. "The primary consideration in

16

determining whether the impairment is substantial is the extent to which reasonable expectations under the contract have been disrupted." Id. "Where, as here, the industry has been heavily regulated, and regulation of contracts is therefore foreseeable, a party's ability to prevail on its Contract Clause challenge is greatly diminished." Alliance of Auto Mfrs., 984 F. Supp. 3d at 54 (citation omitted). There can be no serious dispute that New York's real estate industry is "heavily regulated." An extensive body of law exists to govern the relationship between landlords and tenants, and eviction proceedings and security deposits are areas of specific focus. Some additional regulation of rental contracts was undoubtedly foreseeable, and as EO 202.28 followed on the heels of the similar directives of EO 202.8, issued near the start of the COVID-19 pandemic, even the specific provisions of EO 202.28 were foreseeable. Moreover, foreseeable or not, Plaintiffs have not even suggested that any impairment of their contractual rights was "substantial." To the contrary, the effect of EO 202.28 is limited in duration, and Plaintiffs retain all rights to seek to recoup unpaid rent and recover security deposits—an effect far less "substantial" than the broader, permanent rent stabilization laws that courts have repeatedly upheld.

### 2.    EO 202.28 Serves a Significant Public Purpose

Courts must next consider "whether the law serves a significant public purpose, such as remedying a general social or economic problem." Sanitation and Recycling Indus., 107 F.3d at 993. There can be no question that EO 202.28 serves not just a "significant," but an extraordinarily compelling public purpose. The COVID-19 pandemic and its attendant economic impacts have threatened the lives and livelihoods of millions of New Yorkers, a tragedy that would only be further exacerbated and deepened by rendering them homeless as well. By temporarily delaying the commencement of eviction proceedings for financially distressed renters until August 20th, EO 202.28 serves the compelling public purpose of protecting access to housing during this period of unprecedented instability, and prevents compounding the potential economic damage by forcing

renters out of their homes. The security deposit provision of EO 202.28 serves this purpose as well by permitting renters to avoid non-payment by crediting their security deposits to rent. This has the effect of keeping fewer renters from defaulting on their rent, and allowing them to potentially avoid eviction proceedings and collection of rent arrears even beyond August 20th, while still protecting landlords' interest by requiring regular replenishment of the security deposit.

EO 202.28 also serves the public purpose of promoting and safeguarding public health. Health authorities worldwide and nationwide have directed that minimizing public contact by socially distancing and sheltering in place is a key tool in stopping the spread of the coronavirus, and New Yorkers' adherence to these directives has contributed to the State's recent sharp declines in illness and death, and its progression from the worldwide epicenter of the pandemic to the position along the road to recovery that it is in today.[14] Sheltering in place of course requires a fixed place in which to shelter, and ensuring continuity of housing through the duration of the State's continued process of recovery from the pandemic is vital to protecting public health. Moreover, while evictions often do not take place immediately upon the non-payment of rent, by directing that eviction proceedings may not commence until August 20th, EO 202.28 protects renters from the potential need to attend housing court during a time when excessive public contact can still lead to the resurgence of COVID-19. If only evictions (as opposed to eviction proceedings) were stayed, renters in jurisdictions where some physical court attendance has resumed or is about to do so might be called into housing courts, subjecting litigants, attorneys, court staff, and judges to unnecessary physical contact.[15]

---

[14] See Washington Post, New York City, once the U.S. epicenter of the coronavirus, begins to reopen (June 8, 2020), https://www.washingtonpost.com/nation/2020/06/08/new-york-city-once-us-epicenter-coronavirus-begins-reopen/.

[15] See Curbed New York, 'Health or Their Home': The Risks of Housing Court During a Pandemic (June 12, 2020), https://ny.curbed.com/2020/6/12/21287712/new-york-city-eviction-housing-

18

3.     The Means Utilized by EO 202.28 Are Reasonable and Appropriate

The final factor that courts must consider in determining whether a government directive violates the Contract Clause is "whether the means chosen to accomplish [the significant public] purpose are reasonable and appropriate." Sanitation and Recycling Indus., 107 F.3d at 993; see also Energy Reserves Group, Inc. v. Kansas Power & Light Co., 459 U.S. 400, 411-12 (1983) (a statute challenged under the Contract Clause will be upheld so long as it serves "a significant and legitimate public purpose" and adjusts the contracting parties' rights in a manner that is "appropriate to the public purpose justifying [the law's] adoption").

EO 202.28 uses reasonable and appropriate means to ensure housing stability during the ongoing public health and economic crisis. Most critically, both the eviction moratorium and security deposit provisions are temporary. They do not permanently modify the contractual relationship between landlords and tenants; rather, they are a short-term measure. Additionally, they do not deprive landlords of any rights; at most, they slightly defer landlords' ability to exercise those rights. Landlords will still be able to initiate eviction proceedings against non-paying tenants (they must simply wait until August 20th to do so), and they will still be able to recover rent for occupancy during that period. Notably, Plaintiffs have not made any allegations to the contrary. Nor do the provisions of EO 202.28 deprive landlords of access to tenants' security deposits, as tenants are required to promptly replenish a redirected security deposit. These narrowly tailored, temporary measures function as a "reasonable and appropriate" means to prevent a homelessness and expanded public health epidemic while protecting landlords' rights.

That EO 202.28 is reasonable and appropriate is further evidenced by the fact that the eviction moratorium applies only to renters who are "eligible for unemployment insurance or

court-reopening-coronavirus.

benefits under state or federal law or otherwise facing financial hardship due to the COVID-19 pandemic." EO 202.28. If a renter who has not suffered financial hardship by COVID-19 ceases to pay rent, an eviction proceeding may be commenced once the courts within the applicable county resume operations, which has already occurred in some parts of the State.[16] See, e.g., Decl. of Mark A. Guterman Exs. A-B, ECF No. 8 (Directives and Procedures for the Civil Court of the City of New York, permitting the commencement of eviction proceedings where the landlord submits an affidavit by a person with knowledge of the facts stating that the respondent does not fall within the protection of EO 202.28).

Moreover, the renter protection provisions of EO 202.28 have been accompanied by corresponding protections for some property owners as well. First, EO 202.28 not only imposes a moratorium on eviction proceedings, it also temporarily prohibits the "initiation of a proceeding or enforcement of either an eviction of any residential or commercial tenant, for non-payment of rent <u>or a foreclosure of any residential or commercial mortgage, for non-payment of such mortgage,</u> <u>owned or rented</u> by someone that is eligible for unemployment insurance or benefits under state or federal law or otherwise facing financial hardship due to the COVID-19 pandemic" until August 20, 2020 (emphasis added). EO 202.28. Thus, not only are renters who face financial hardship protected, owners who rent to those tenants or who face hardship themselves are protected

---

[16] Unlike in New York City, courts in Westchester County, where Plaintiffs wish to potentially bring eviction proceedings, have not yet opened for that type of proceeding. See Sixth Amended Administrative Order (June 9, 2020), Ninth Judicial District, https://www.nycourts.gov/LegacyPDFS/courts/9jd/pdfs/SIXTH_AMENDED_Administrative_Order.pdf. To the extent that Plaintiffs argue that EO 202.28 is unconstitutional as a result of their inability to commence eviction proceedings in Westchester County against renters who do not fall within the protections of EO 202.28, Plaintiffs' complaint lies with the Westchester County courts' procedures, rather than with the Executive Order. Moreover, that any such complaint applies only to some counties within the State again reinforces the inability of Plaintiffs to successfully mount a facial challenge to EO 202.28 as unconstitutional with respect to all possible plaintiffs.

as well if they are unable to satisfy their mortgage obligations. Additionally, on March 21, 2020, Governor Cuomo issued Executive Order 202.9, which directed financial institutions regulated by the New York State Department of Financial Services ("DFS") to provide financial relief to New Yorkers experiencing financial hardship as a result of the pandemic. Pursuant to this directive, DFS issued new regulations requiring covered mortgage lenders to "make applications for forbearance of any payment due on a residential mortgage of a property located in New York, widely available to any individual who resides in New York and who demonstrates financial hardship as a result of the COVID-19 pandemic" for at least 90 days, further assisting owners of residential property who rent to financially distressed tenants.[17] Further, the security deposit provision of EO 202.28 challenged by Plaintiffs is itself a balanced, landlord-friendly directive, in that it creates an additional source of funds from which rent can be paid, assuring landlords at least one more month of payment during the temporary moratorium on eviction proceedings. While Plaintiffs obviously and understandably would like further relief beyond these measures (as would residential and commercial tenants), the existing protections and temporary, narrowly tailored scope of EO 202.28 render the challenged measures "reasonable and appropriate" to serve the critical public purpose they are intended to address.

### III.    EO 202.28 DOES NOT VIOLATE PLAINTIFFS' DUE PROCESS RIGHTS

In addition to their claims that EO 202.28 effects a taking and violates the Contract Clause, Plaintiffs also bring a perfunctory claim that EO 202.28 violates their rights to procedural due process under the Fourteenth Amendment. Pl. Memo., p.13. However, neither the temporary moratorium on eviction proceedings against some tenants nor allowing tenants to direct security

---

[17] 3 N.Y.C.R.R. § 119.1,
https://www.dfs.ny.gov/system/files/documents/2020/03/re_new_pt119_nycrr3_text.pdf.

deposits toward rent actually deprives Plaintiffs of any such rights.

A procedural due process claim requires a plaintiff to satisfy three elements: "To plead a violation of procedural due process, . . . a plaintiff must first identify a property right, second show that the government has deprived him of that right, and third show that the deprivation was effected without due process." Gizzo v. Ben-Habib, 44 F. Supp. 3d 374, 380–81 (S.D.N.Y. 2014), citing J.S. v. T'Kach, 714 F.3d 99, 105 (2d Cir. 2013). All three elements are lacking here.

First, Plaintiffs' thin argument on this issue do not identify what property right has supposedly been violated beyond the property interests already addressed by their Fifth Amendment takings claim. The Second Circuit has explicitly held that due process claims that are duplicative of takings claims cannot be maintained. See Harmon v. Markus, 412 F. App'x 420 (2d Cir. 2011). In Harmon, the Second Circuit analyzed (and rejected) property owners' Takings Clause challenge to rent stabilization laws on its merits, and summarily rejected the owners' due process claim "as a matter of law." Id. As the court explained: "[T]he Due Process Clause cannot 'do the work of the Takings Clause' because '[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims[.]'" Id. (quoting Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envt'l Prot., 560 U.S. 702, 721 (2010) (internal quotation marks and citation omitted)); accord Wellswood Columbia, LLC v. Town of Hebron, No. 3:10-CV-01467, 2013 WL 356619, at *4 (D. Conn. Jan. 29, 2013) (dismissing substantive due process claim as duplicative of Takings Clause claim), on reconsideration in part, 2013 WL 5435532 (D. Conn. Sept. 30, 2013). Further, with respect to security deposits directed toward rent, Plaintiffs manifestly have no property interest in those funds. As Plaintiffs themselves admit, "pursuant to the law of the State of New York, the

22

[security] deposits remained the property of the respective tenants[.]" Compl. ¶ 28.

Second, even if Plaintiffs' due process claim were independent of their takings claim, they can still show no deprivation of their rights. While Plaintiffs do have a right to ownership of their property, there is no constitutional right to rent that property without government regulation, and as related takings clause cases make clear, Plaintiffs have no cognizable property interest in any particular rate of return on their rental units. See Fed. Home Loan Mtge. Corp. v. N.Y. State Div. of Hous. & Cmty. Renewal, 83 F.3d 45 (2d Cir. 1996) (citing Bowles v. Willingham, 321 U.S. 503, 517 (1944) (reduction of value of property as result of regulation does not constitute taking)); Park Ave. Tower Assocs. v. City of N.Y., 746 F.2d 135, 139-40 (2d Cir. 1984) (owner is not guaranteed "reasonable return" on investment); Rent Stabilization Ass'n v. Dinkins, 805 F. Supp. 159, 163 (S.D.N.Y. 1992) (rent regulation does not constitute regulatory taking simply because it denies owners reasonable return on property), aff'd, 5 F.3d 591 (2d Cir. 1993); Greystone Hotel Co., 13 F. Supp.2d 524, 528 (S.D.N.Y. 1998) (holding that a property owner has "no constitutional right to what it could have received in an unregulated market"). And, in any event, Plaintiffs have not lost any legal claim to rent for the entirety of any term of occupancy. While certain eviction proceedings may be delayed, property owners are still owed rent for the entire period of occupancy, and on August 20, 2020, may initiate legal proceedings to collect any arrears, or may at any time engage in negotiations with tenants regarding occupancy and payment. Again, Plaintiffs have not made any specific factual allegations in amplification of their claims.

Finally, even if Plaintiffs had identified an independently justiciable property right and had shown that they had been deprived of it in some way, this deprivation is not without process. As described throughout this memorandum, Plaintiffs (a) may still commence proceedings against tenants who are not eligible for federal or state unemployment benefits and are not otherwise facing

financial hardship, and (b) will be able to commence proceedings against all other tenants as of August 20, 2020. In both cases, Plaintiffs have recourse against non-paying tenants, and the <u>temporary</u> inability to file a proceeding does not attenuate this recourse so as to run afoul of due process. Plaintiffs themselves note that non-payment proceedings are often delayed for "several months" even under normal circumstances, Pl. Mem. p.2, and make no argument that the slight additional delay imposed by EO 202.28 is uniquely burdensome in light of the fact that delays of that magnitude routinely occur regardless. Where a delay in obtaining a judicial determination is alleged to infringe on due process, "the significance of such a delay cannot be evaluated in a vacuum. In determining how long a delay is justified in affording a post-suspension hearing and decision, it is appropriate to examine the importance of the private interest and the harm to this interest occasioned by delay; the justification offered by the Government for delay and its relation to the underlying governmental interest; and the likelihood that the interim decision may have been mistaken." <u>Fed. Deposit Ins. Corp. v. Mallen</u>, 486 U.S. 230, 242 (1988). Here, in light of the State's extraordinary interest in preventing a public health and financial crisis from compounding into a homelessness crisis; the limited, temporary nature of the delay; and the lack of harm to Plaintiffs due to the retention of their right to recover unpaid rent, being required to wait until August 20, 2020, to initiate eviction proceedings is not a violation of procedural due process.

In sum, Plaintiffs' conclusory allegations that their procedural due process have been violated do not suffice to show that any of their constitutional rights have been violated.

## IV.   PLAINTIFFS' STATE LAW CLAIMS ARE BARRED BY ELEVENTH AMENDMENT IMMUNITY

The remainder of Plaintiffs' claims allege various ways in which EO 202.28 supposedly violates New York Executive Law § 29-a or the New York State Constitution. While these conclusory allegations lack merit, they are not, in any case, justiciable by this Court pursuant to

the doctrine of state sovereign immunity enshrined in the Eleventh Amendment to the U.S. Constitution. See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 103–06 (1984) (Eleventh Amendment prevents suit requiring state official to follow state law). The Eleventh Amendment prohibits lawsuits against a state without the state's unambiguous consent or an act of Congress. See Seminole Tribe of Florida v. Florida, 517 U.S. 44, 54-55 (1996). A narrow exception to Eleventh Amendment immunity exists under the Ex parte Young doctrine, which permits "suits against state officers acting in their official capacities that seek prospective injunctive relief to prevent a continuing violation of federal law," but "Young does not allow a federal court to issue an injunction for a violation of state law." Kelly v. N.Y. Civil Service Comm'n, 632 F. App'x 17, 18 (2d Cir. 2016) (summary order); accord Treistman v. McGinty, 804 F. App'x 98 (2d Cir. 2020) (summary order) ("A claim that state officials violated state law in carrying out their official responsibilities is a claim against the State that is protected by the Eleventh Amendment."). Plaintiffs' request for a declaratory judgment concerning claims under New York State statutory and constitutional laws can only be brought in a New York State court.

Additionally, Plaintiffs' demand for "at least nominal damages" against Governor Cuomo is barred in its entirety by Eleventh Amendment immunity, as the Ex parte Young exception only permits prospective injunctive relief against state officials acting in their official capacities.

## CONCLUSION

For the reasons set forth above, Governor Cuomo respectfully requests that the Court deny Plaintiffs' motion for summary judgment and grant his cross-motion for summary judgment dismissing the Complaint, together with such other relief as the Court may grant.

Dated: New York, New York
      June 18, 2020

**LETITIA JAMES**
Attorney General
State of New York
*Attorney for Governor Andrew Cuomo*

By: /s/ Matthew L. Conrad
    MATTHEW L. CONRAD
    Assistant Attorney General
    28 Liberty Street
    New York, NY 10005
    (212) 416-8610