**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
ELMSFORD APARTMENT ASSOCIATES, LLC,
36 APARTMENT ASSOCAITES, LLC, and
66 APARTMENT ASSOCIATS, J.V.,

                    Plaintiffs,

           v.                                     20-cv-4062 (CM)

ANDREW CUOMO, as Governor of the State
of New York,

                    Defendant.
--------------------------------------------------------X

## ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

McMahon, C.J.

      The world is navigating the deadliest pandemic in over a century.  Presently, the United States has suffered more than any other country, reporting over two million cases of the novel coronavirus known as COVID-19, and over one hundred and twenty thousand deaths as a result.[1]  Among the fifty states, New York has experienced the highest number of cases, with nearly four hundred thousand cases and twenty-five thousand dead.[2]

      The New York State Legislature and the Governor, Defendant Andrew Cuomo, have worked together to respond to this evolving crisis and its effects on the health, safety, and economic wellbeing of New Yorkers.  At issue here is the Governor's Executive Order 202.28, "Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency," issued May 7, 2020 (the "Order" or "EO 202.28"), which, *inter alia*, temporarily

---

[1] *See Coronavirus Disease 2019 (COVID-19): Cases in the U.S.*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited June 29, 2020).
[2] *See New York State Department of Health COVID-19 Tracker*, available at https://covid19tracker.health.ny.gov/views/NYS-COVID19-Tracker/NYSDOHCOVID-19Tracker-Map?%3Aembed=yes&%3Atoolbar=no&%3Atabs=n  (last visited June 29, 2020).

permits tenants to apply their security deposit funds to rents due and owing – provided the tenants replenish those funds at a later date – and temporarily prohibits landlords from initiating eviction proceedings against tenants who are facing financial hardship due to the pandemic.

Three residential landlords – Plaintiffs Elmsford Apartment Associates, LLC; 36 Apartment Associates, LLC; and 66 Apartment Associates, J.V. ("Plaintiffs") – ask this Court to enjoin EO 202.28 on the grounds that the Order violates their rights under the United States Constitution's Contracts Clause, Takings Clause, Due Process Clause and Petition Clause.[3] While the Plaintiffs initially sought only a temporary restraining order and preliminary injunction, the parties agreed that Plaintiffs' challenge turns entirely on legal issues that required no discovery and could be resolved on cross-motions for summary judgment.  After an expedited briefing schedule, the Court heard oral argument via telephone conference on June 24, 2020.

For the following reasons, Plaintiffs' motion for summary judgment is denied, and Defendant's motion for summary judgment dismissing this action is granted.

## BACKGROUND

### A.  New York's response to COVID-19

On March 2, 2020, in response to the first reported cases of  COVID-19 in New York state, the legislature passed Senate Bill S7919, which afforded Governor Cuomo the power to suspend statutes or regulations, and issue necessary accompanying directives, in the event of an epidemic or other disease outbreak.  *See* SB S7919; N.Y. Exec. Law Art. 2-B § 29-a. Specifically, Governor Cuomo may respond to the current pandemic by:

> "temporarily suspend[ing] any statute, local law, ordinance, or order, rules or regulations, or parts thereof, or any agency during a state disaster emergency, if compliance with such

---

[3] The complaint originally sought relief under the New York State Constitution as well (*see* Dkt. No. 1, Compl. ¶ 43), but constitutional principles of federalism and state sovereign immunity constraint this Court from judging a New York official's interpretation and application of New York law. State constitutional issues will not be further addressed.  For a brief discussion of non-constitutional state law issues, *see* Point I, *infra*.

provisions would prevent, hinder, or delay action necessary to cope with the disaster or if necessary to assist or aid in coping with such disaster."

N.Y. Exec. Law Art. 2-B § 29-a.  Any such suspensions must be "in the interest of the health or welfare of the public," "reasonably necessary to aid the disaster effort," and must "provide for the minimum deviation" from pre-suspension legal requirements "consistent with the goals of the disaster action deemed necessary." *Id.*  Suspensions are only authorized for period of 30 days, although Section 29 of the amended Executive Law allows the Governor to "extend the suspension[s] for additional periods not to exceed thirty days each." *Id.*

To reduce the spread of COVID-19, government officials around the world ordered all "non-essential" businesses closed, and instructed their constituents to shelter in place, so that medical professionals and other first responders could try to stem the exponential wave of infections that reached catastrophic levels in mid-March.  By mid-March, New York State was rapidly becoming the epicenter of this unprecedented public health crisis. Governor Cuomo declared a statewide emergency on March 6.  (EO 202.)  On March 20, he ordered all non-essential businesses either to close or to require their employees to work from home. (EO 202.8.)  The initial orders also prohibited public gatherings not related to essential work.

These indefinite disruptions to everyday life had a number of second-order economic effects.  Tens of millions of Americans filed for unemployment in the weeks following the stay-at-home orders, as bars, restaurants, shops, and live entertainment venues were forced to close.[4] As a result of these shutdowns, more and more households were forced to eat into their financial

---

[4] *See* Rakesh Kochnar, Pew Research Center, "Unemployment rose higher in three months of COVID-19 than it did in two years of the Great Recession" (June 11, 2020), https://www.pewresearch.org/facttank/2020/06/11/unemployment-rose-higher-in-three-months-of-covid-19-than-it-did-in-twoyears-of-the-great-recession/ (last visiting June 22, 2020).

resources as they waited out the emergency.  Many are still waiting as New York continues to gradually reopen sectors of the economy.

On March 27, 2020, the federal government enacted the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act").  The CARES Act provided numerous forms of relief to affected industries and industries,  including a prohibition against new eviction cases filed by housing providers who participate in certain federal housing rental programs on the basis of non-payment of rent.  *See* 15 U.S.C. § 9058.

Which brings us to the order that is the subject of this lawsuit.

**B.  The Order Under Review**

On March 20, 2020, in response to this emergency. Governor Cuomo issued EO 202.8 (the "First Moratorium") – the first of several orders designed to prohibit the eviction or foreclosure of either residential or commercial tenants for a period of 90 days. As he did when initially declaring a state of emergency, Governor Cuomo said the measures included in EO 202.8 were justified in light of "travel-related cases and community contact transmission of COVID-19" which were "documented in New York State and expected to . . . continue," and because allowing landlords to continue evictions and foreclosures "would prevent, hinder, or delay action necessary to cope with the disaster emergency."

Governor Cuomo later issued the challenged Order, EO 202.28, on May 7, 2020.  (*See* Executive Order 202.28, "Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency," available at https://www.governor.ny.gov/news/no-20228-continuing-temporary-suspension-and-modification-laws-relating-disaster-emergency.)  The Order contains two sections that, while suspending the operation of certain state laws, have the effect of modifying existing relationships between landlords and their tenants.

4

### i. Security Deposit Provisions

The Order suspends Sections 7-103, 7-107 and 7-108 of the General Obligations Law,

dealing with the rights and obligations of lessors and lessees with respect to security deposits, for

thirty days.  Security deposits are deposits of rent – most commonly, one month's rent – to

provide the landlord with security for the making of repairs to damage caused by the tenant once

the tenant vacates the premises. By law, the landlord must place the security deposit into an

interest bearing account for the benefit of the tenant (who retains legal title to the funds). The

tenant is entitled to the return of the security deposit, with interest, at the conclusion of the lease,

unless the landlord needs to use the funds to make repairs in order to re-lease the premises. All

this is governed by the cited sections of the General Obligations Law.

 The Order temporarily suspends the operation of the usual procedures governing the use

of security deposits in order to permit tenants to apply their security deposit funds to rental

payments:

> Landlords and tenants or licensees of residential properties may, upon the consent of the
> tenant or licensee, enter into a written agreement by which the security deposit and any
> interest accrued thereof, shall be used to pay rent that is in arrears or will become due. If
> the amount of the deposit represents less than a full month rent payment, this consent
> does not constitute a waiver of the remaining rent due and owing for that
> month.  Execution in counterpart by email will constitute sufficient execution for
> consent;

> Landlords shall provide such relief to tenants or licensees who so request it that are
> eligible for unemployment insurance or benefits under state or federal law or are
> otherwise facing financial hardship due to the COVID-19 pandemic;

> It shall be at the tenant or licensee's option to enter into such an agreement and landlords
> shall not harass, threaten or engage in any harmful act to compel such agreement;

> Any security deposit used as a payment of rent shall be replenished by the tenant or
> licensee, to be paid at the rate of 1/12 the amount used as rent per month. The payments
> to replenish the security deposit shall become due and owing no less than 90 days from
> the date of the usage of the security deposit as rent. The tenant or licensee may, at their
> sole option, retain insurance that provides relief for the landlord in lieu of the monthly

security deposit replenishment, which the landlord, must accept such insurance as replenishment.

Even if the landlord does not want the tenant to use his security deposit to cover a month's rent, the tenant may invoke these new procedures and the landlord must allow it to do so.

### ii.  Eviction Moratorium

The order also suspends the landlord's ability to commence eviction proceedings for nonpayment of rent pursuant to Article 7 of the Real Property Actions and Proceedings Law , ("RPAPL") and Article 7 of the Real Property Law ("RPL").  (*See* Pl. Br. at 2-3.)  That law (to which reference is made in many standard leases) provides that, after following certain procedures, the landlord may commence what is known as a summary non-payment proceeding in order to evict the tenant who is occupying leased premises without paying rent and obtain a money judgment for any unpaid rent. Specifically, the order provides:

> "There shall be no initiation of a proceeding or enforcement of either an eviction of any residential or commercial tenant, for nonpayment of rent or a foreclosure of any residential or commercial mortgage, for nonpayment of such mortgage, owned or rented by someone that is eligible for unemployment insurance or benefits under state or federal law or otherwise facing financial hardship due to the COVID-19 pandemic for a period of sixty days beginning on June 20, 2020."

A bit of background is in order. Evicting a tenant – especially a residential tenant – in New York is a slow, cumbersome and extremely tenant-favorable process, especially when compared to analogous procedures in other states. As Plaintiffs acknowledge, tenants in New York City enjoy even more generous protections.  (Dkt. No. 10, Pl.'s Br. at 2 n.1.)  The way the process actually plays out belies the term "summary proceeding" that is statutorily authorized to recover real property from a non-paying tenant.

To secure an eviction warrant from the housing courts, a New York landlord must serve the tenant a notice of nonreceipt of payment (*see* RPL § 235-e(d)), and give the tenant one final

chance to pay by making a demand of payment within 14 days (*See* RPAPL § 711(2)). If the

landlord is still owed payment after two weeks have passed, he may commence what is known as

a summary nonpayment proceeding by filing a petition in the civil court, returnable by the tenant

within 10 days.  (RPAPL § 732(1).) If the tenant does not respond in ten days, the court may (but

rarely does) issue an eviction warrant immediately.  (RPAPL § 732(3).)  However, if the tenant

does respond, however, a trial is set for eight days hence.  (RPAPL § 732(2).)  The trial may be

adjourned up to ten additional days if the parties so require in order to produce their witnesses.

(RPAPL § 745(1).)

If, after trial, a judgment is entered for the landlord and the court issues a warrant for

eviction, the Sheriff must give the tenant 14 days' notice in writing prior to execution.  (*See*

RPAPL § 749(2)(a).)   There are the usual provisions for appeal (to the Appellate Term of

Supreme Court) and stays issue routinely so that non-defaulting tenants are not evicted before

their cases are fully reviewed.

But even if the evidence supports a judgment for the landlord, the housing court is not

required to order the tenant's immediate eviction.  A tenant may obtain a stay of the issuance of

the warrant for up to one year by showing that "it would occasion extreme hardship to the

[tenant] or the [tenant's] family if the stay were not granted." (RPAPL § 753(1).) Such stays are

far from uncommon.

On June 6, 2020, Governor Cuomo issued Executive Order 202.38, which renewed the

security deposit provision of EO 202.38 for an additional 30 days, but did not extend the eviction

moratorium period beyond August 19. (*See* Executive Order 202.38, "Continuing Temporary

Suspension and Modification of Laws Relating to the Disaster Emergency," *available at*

https://www.governor.ny.gov/news/no-20238-continuing-temporary-suspension-and-modification-laws-relating-disaster-emergency.)

The Governor's Order does not address any summary proceeding that was commenced prior to its effective date; however, as a practical matter, there was not much that a landlord could do to prosecute an ongoing proceeding, as the New York State courts were closed until very recently. (*See* March 16, 2020 Administrative Order, AO/68/20, *available at* nycourts.gov/latest-AO.shtml (suspending "All eviction proceedings and pending eviction orders . . . until further notice").)  Also, Governor Cuomo did nothing to impede the commencement of holdover proceedings brought when a tenant fails to cure a violation of the terms of its lease – such as when a tenant enters into an unauthorized sublease, *see, e.g.*, *Mann Theatres Corp. of Calif. v. Mid-Island Shopping Plaza, Inc.*, 94 A.D.2d 466, 464 N.Y.S.2d 793, 799 (2d Dep't 1983), operates a "bawdy-house" on the premises, *see* RPAPL § 711(5), or overstays their agreed lease term, *see, e.g*, *Riverdale Realty Development LLC v. EJM Rest. Corp.*, 65 Misc.3d 1227(A), 119 N.Y.S.3d 706 (Table), 2019 WL 6335262, at *1 (N.Y. Civ. Ct. Nov. 25, 2019). Nor does EO 202.28 suspends the landlords' right to initiate a common law breach of contract action in the New York State Supreme Court to redress a tenant's failure to perform its payment obligations under his or her lease, *see, e.g.*, *1000 Northern of N.Y. Co. v. Great Neck Med. Assocs.*, 7 A.D.3d 592, 775 N.Y.S.2d 884 (2d Dep't 2004) – although this court recognizes that such a remedy is not the one to which landlords usually resort.

## C.  The Current Availability of Eviction Remedies in New York Civil Courts

The First Moratorium, which placed a 90-day pause on all evictions, whether commenced for reason of nonpayment of rent or otherwise, expired on June 20.  Recognizing the potential for confusion – compounded by New York's gradual and incomplete reopening of public spaces

across the state, including state courts – Chief Administrative Judge Lawrence K. Marks issued

an order clarifying the current availability of eviction remedies.  (Dkt. No. 23, Reply Decl. of M.

Guterman, Ex. 1 (the "Administrative Order" or "AO") at 1.)

The Administrative Order permits landlords to file a new eviction petition electronically,

provided that the petition includes an affirmation that, to the best of the landlord's knowledge,

the petition "comports with the requirements of . . . Executive Order 202.28." (*Id.* at 3.)

Although landlords remain barred from initiating new summary proceedings "for nonpayment of

rent" against a tenant "eligible for unemployment insurance or benefits under state or federal law

or otherwise facing financial hardship," they may seek eviction of any tenant for any reason

other than nonpayment of rent. (*Id.*)

However, the Administrative Order only allows the action to be filed; it cannot proceed

to trial as long as "state and federal emergency measures addressing the COVID-19 pandemic"

remain in place. (AO at 1.) All RPAPL eviction matters, new or old, "shall continue to be

suspended," although parties represented by counsel may schedule virtual, judicially-supervised

settlement conferences.  (*Id.*)

### D.  The Pending Motion

Plaintiffs assert that EO 202.28 violates their rights under the Contracts Clause by

allowing security deposit funds to be disposed contrary to the terms of the parties' leases, as well

as by denying the landlords a forum in which to commence (or, presumably, prosecute) eviction

proceedings for non-payment of rent, a remedy to which they claim at least an implied

contractual right. Plaintiffs further argue that Governor Cuomo's denial of access to housing

court for the prosecution of summary nonpayment proceedings violates their rights under

Petition Clause of the First Amendment. Finally, they claim that the Order violates both the

Takings Clause and the procedural due process protections of the Fourteenth Amendment, because the temporary suspension of evictions forces landlords to provide their property for use as housing without just compensation. (Dkt. No. 10, at 1.)

Governor Cuomo argues in response that the temporary modifications to New York's residential rent regulation scheme do not violate the Constitution because they do not upset a landlord's expectations relating to state interference with their business operations. EO 202.28 neither robs the Plaintiffs' of the entire value of their property interests nor does it bar them from vindicating those interests to the fullest extent provided by lease and by law once the current health crisis has abated. He urges that state governments are entitled to deference when their exercise of the police power to protect the general welfare of their citizens incidentally burdens private contractual relationships, and points out that the purely temporary nature of the burden to the landlords renders that burden "incidental" as a matter of law. (Dkt. No. 21.)

The Court has also received and reviewed the brief of *amici curiae* Housing Court Answers, Mount Vernon United Tenants, and United Tenants of Albany (collectively, the "*Amici*"). (Dkt. No. 19.) In addition to the arguments made by Governor Cuomo, *Amici* stress that lifting the eviction moratorium "would require tenants to make impossible choices between their health (and the community's health) and their homes," and could ultimately "risk further spread of COVID-19," thus aggravating the very emergency that the Governor and the Legislature hoped to curtail. (Dkt. No. 19 at 5-6.) Even worse, based on *Amici's* experience, the housing courts would experience "extreme stress" and overcrowding if tenants, landlords, court officials, and counsel were forced to cram into housing courts in order to attend evictions proceedings, thereby exacerbating the current public health emergency. (*Id.* at 6-7.)

10

## LEGAL STANDARD

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  When considering cross-motions for summary judgment, "all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).  As a government actor, it is the Defendant's burden to justify its actions as consistent with the U.S. Constitution. *See Vugo, Inc. v. City of New York*, 931 F.3d 42, 48 (2d Cir. 2019) (citing *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571-72, 131 S.Ct. 2653, 180 L.Ed.2d 544 (2011)).

Because Plaintiffs do not allege imminent or actual harm to any particular property interest or contractual relationship as a result of the Order, the parties agreed at the June 5 conference that this case takes the form of a facial challenge.  As the Supreme Court has held, a facial challenge "is . . . the most difficult challenge to mount successfully, since the challenger must establish no set of circumstances under which the Act would be valid."  *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987).   Outside of the First Amendment context, "facial challenges to legislation are generally disfavored." *Sanitation & Recycling Indus., Inc. v. City of New York ("Sanitation I")*, 928 F. Supp. 407, 416 (S.D.N.Y.

1996) (quoting *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 223, 110 S.Ct. 596, 107 L.Ed.2d

603 (1990)).

## DISCUSSION

### I. This Court Does Not Have Jurisdiction to Enjoin Purported Violations of the Executive Law or the New York State Constitution.

Before reaching the constitutional issues, the Court must first make clear that it lacks the

jurisdiction necessary to reach the merits of the state law questions raised in Plaintiffs' papers.

Plaintiffs claim that the Governor "has effectively legislated new laws" in violation of the

Executive Law and the New York Constitution (Pl.'s Br. at 7-13; Reply at 14-16.) For instance,

Plaintiffs object to the imposition of a 60-day eviction moratorium in light of the language in §

29-a forbidding suspensions "in excess of thirty days."  (*Id.* (citing N.Y. Exec. Law Art. 2-B §

29-a(2)(a)).)

Federal courts do not have the power to address claims that Governor Cuomo has

violated state law. While it may be the case that Governor has overstepped his authority under

New York's Executive Law, curing those alleged harms would require this Court to ignore the

doctrine of state sovereign immunity and principles of federalism embodied in the Eleventh

Amendment.  As the Supreme Court has said, "it is difficult to think of a greater intrusion on

state sovereignty than . . . a federal court instruct[ing] state officials on how to conform their

conduct to state law." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106, 104 S.Ct.

900, 79 L.Ed.2d 67 (1984). In *Pennhurst*, the Supreme Court ruled that federal courts could not

grant relief against state officials for their purported violations of state law, because doing so

does not implicate any aspect of federal law, nor does it "vindicate the supreme authority of

federal law."  *Id.*  Therefore, efforts to cure violations of state law fall beyond the jurisdiction of

federal courts, because they do not "aris[e] under the Constitution, the Laws of the United States, [or] Treaties . . . ." U.S. Const. Art. III § 2.

The only acknowledged exception to the rule in *Pennhurst* is not applicable here.  A federal court may intervene when a state official "may be said to act *ultra vires*," meaning that he or she "acts without any authority whatever."  *Id.* at 101 n.11 (internal quotation marks omitted).  Yet, by their own admission, Plaintiffs "do not argue . . . that Executive Law § 29-a as amended is, itself, unconstitutional." (Pl.'s Br. at 11 n.3.)  Their claim is not that the Governor lacks the power to respond to the COVID-19 emergency – only that he has abused that power.  Therefore, by seeking redress for Governor Cuomo's alleged violations of the authority delegated to him by the New York legislature, Plaintiffs ask the Court "to police the boundaries of [state law]," *ACA Int'l v. Healey*, No. 20-cv-10767, 2020 WL 2198366, at *4 (D. Mass. May 6, 2020).

In *ACA*, the District of Massachusetts rejected similar arguments made against a regulation promulgated in response to COVID-19, citing *Pennhurst* to conclude that federal courts may not enjoin the actions of state officials for purported violations of state law. I concur with the court in that case: this Court lacks jurisdiction to address the issues of New York law raised in Plaintiffs' papers.

## II.    EO 202.28 Does Not Violate Plaintiffs' Rights Under the Takings Clause.

The Takings Clause of the Fifth Amendment provides that no "private property shall be taken for public use, without just compensation." U.S. Const. Amend. V. The clause applies to the states through the Fourteenth Amendment. *See Kelo v. New London,* 545 U.S. 469, 125 S.Ct. 2655, 2658 n. 1, 162 L.Ed.2d 439 (2005).  Courts have construed "private property" to include rights secured in private contract, but parties cannot simply "'remove the subject matter of their

agreement by making contracts about them'." *Sanitation I*, 928 F. Supp. at 416 (citing *Connolly v. Pension Ben. Guar. Corp.*, 475 U.S. 211, 223-24, 106 S. Ct. 1018, 89 L. Ed. 2d 166 (1986)).

"The law recognizes two species of takings: physical takings and regulatory takings." *Buffalo Teachers Fed'n v. Tobe,* 464 F.3d 362, 374 (2d Cir.2006). "The paradigmatic taking requiring just compensation," known as a physical taking, "is a direct government appropriation or physical invasion of private property." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005). A regulatory taking occurs "when the government acts in a regulatory capacity." *Buffalo Teachers*, 464 F.3d at 374. "The gravamen of a regulatory taking claim is that the state regulation goes too far and in essence effects a taking." *Id.* (internal quotation marks omitted).

Plaintiffs fails to demonstrate that the Order cause them to suffer either type of taking.

### A.  EO 202.28 does not constitute a physical taking.

"[T]he government affects a physical taking only where it requires the landowner to submit to the physical occupation of his land." *Yee v. City of Escondido, Cal.*, 503 U.S. 519, 527 (1992); *accord Southview Assocs., Ltd. v. Bongartz*, 980 F.2d 84, 94 (2d Cir. 1992). Government action that does not entail a physical occupation, but merely affects the use and value of private property, does not result in a physical taking of property.

The Supreme Court has ruled that a state does not commit a physical taking when it restricts the circumstances in which tenants may be evicted. For example, in *Yee v. City of Escondido*, mobile home park owners challenged a municipal rent control ordinance and a California statute that "limit[ed] the bases upon which a park owner may terminate a mobile homeowner's tenancy." *Yee*, 503 U.S. at 524. They argued that this regime of mobile home regulations effected a physical taking because "what has been transferred from park 10 owner to

14

mobile homeowner is no less than a right of physical occupation of the park owner's land." *Id*. at 527. The Supreme Court rejected the park owners' argument, holding that it "cannot be squared with our cases on physical takings," which occur only when the government "requires the landowner to submit to the physical occupation of his land." *Id*. The local rent controls and state law at issue in Yee "authorize[d] no such thing." To the contrary, the park owners "voluntarily rented their land to mobile homeowners . . . . Put bluntly, no government has required any physical invasion of petitioners' property. Petitioners' tenants were invited by petitioners, not forced upon them by the government." *Id*. at 528. The Second Circuit, in evaluating New York's rent control laws, has agreed, holding that these laws "regulate[] land use rather than effecting a physical occupation." *W. 95 Hous. Corp. v. New York City Dep't of Hous. Pres. & Dev.*, 31 F. App'x 19, 21 (2d Cir. 2002); *see also Harmon v. Markus*, 412 F. App'x 420, 422 (2d Cir. 2011) (affirming dismissal of physical takings claim on the ground that the rent stabilization law "does not affect permanent physical occupation of the [owners'] property").

Second Circuit precedent further clarifies that restrictions like those contained in EO 202.28 do not amount to a physical taking.  In this circuit, a physical taking only occurs when "a government has committed or authorized a permanent physical occupation of property." *Southview Assocs., Ltd. v. Bongartz*, 980 F.2d 84, 92-93 (2d Cir. 1992).  "The *absolute* exclusivity of the occupation, and the *absolute* deprivation of the owner's right to use and exclude others from the property . . . [are] the hallmarks of a physical taking." *Id.* at 93 (emphasis in original) (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 n.12, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982)). In *Southview*, the court upheld the Vermont Environmental Commission's decision to deny a building permit to a developer whose plans would have threatened a white-tail deer population, because the plaintiff "retain[ed] substantial

power to control the use of the property." *Id.* at 94.  So too here: because the landlords fail to show that EO 202.28 denies them control of their property, which they continue to rent to their tenants, and collect rents from, a temporary halt on evictions does not take on the character of a physical taking.

Nor does the fact that the landlords object to some tenants' continued occupancy in a subset of their units transform the Order enabling those occupancies into a physical taking.  In *Kirsh v. City of New York*, No. 94-cv-8489, 1995 WL 383236 (S.D.N.Y. June 27, 1995), the court held that New York State does not violate the Takings Clause when it assumes management of a property from a landlord and rents units therein to parties without the landlords' approval. *Id.* at *5.  In that case, the Civil Court exercised its authority under Article 7A of RPAPL to appoint administrators to manage a particular property in response to a number of tenant complaints alleging harassment by their landlords.  The plaintiff landlords challenged the Housing Court's order as a physical taking, complaining that the administrators were permitted to decrease rent, spend the landlord's funds on repairs, and rent vacant units.  Even though the administration went on for over six years, the Court rejected the landlord's physical takings claim, reasoning "7A administration does not constitute a permanent, physical occupation because the City has not permanently extinguished [the landlord's] property rights." *Id.*

Plaintiffs have temporarily lost the ability to expel tenants facing COVID-related financial setbacks.  They argue that these restrictions prohibit them from asserting their implied contractual rights to summary proceedings for nonpayment under RPAPL § 711(2), thereby "effectively creat[ing] an actual, state-sponsored occupancy" of the units that amounts to a physical taking.  (Dkt. No. 10, Pl.'s Br. at 14.)  However, the intrusions at issue in this case pose

16

a much shorter and less significant burden to Plaintiffs' property rights than those upheld in *Kirsh*. First, contrary to the Plaintiffs' insinuation that the Governor will extend duration of the Order as long as he can, into 2021 (Dkt. No 24, Pl.'s Reply at 6), there is nothing permanent about EO 202.28; it expires on August 19. Second, the Order preserves Plaintiffs' rights as property owners to either obtain a warrant for eviction or sue their tenant (or former tenants, or the successors and assigns of the former tenant) for back rent. And, finally, the Order neither reduces the amount a tenant must pay their landlord for occupying the apartments, nor forgives the tenant's rental obligations altogether, thereby allowing them to live on the landlord's property rent free.

As long as the order is in place, tenants will continue to accrue arrearages, which the landlord will be able to collect with interest once the Order has expired. Furthermore, landlords will regain their ability to evict tenants once the Order expires. Since EO 202.28 is temporary on its face, and does not disturb the landlords' ability to vindicate their property rights, the Order is one more example of "government regulation of the rental relationship [that] does not constitute a physical taking." *Fed. Home Loan Mtge. Corp. v. N.Y.S. Div. of Hous. & Cmty. Renewal ("FHMLC")*, 83 F.3d 45, 47-48 (2d Cir. 1996) (citing *Yee*, 503 U.S. at 529).

**B. EO 202.28 does not constitute a regulatory taking.**

Regulatory takings may be either categorical or non-categorical. *Huntleigh USA Corp. v. United States*, 525 F.3d 1370, 1378 n. 2 (Fed. Cir. 2008). A categorical regulatory taking occurs in "the extraordinary circumstance when *no* productive or economically beneficial use of land is permitted." *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 330, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002) (emphasis in original). The Order is clearly not a categorical regulatory taking, since Plaintiffs still enjoy many economic benefits of

17

ownership.  Even under the eviction moratorium, landlords can continue to accept rental payments from tenants not facing financial hardship, while also covering the cost of ownership by collecting security deposit funds from consenting tenants who have been affected by the pandemic.  As such, their properties have not been rendered "worthless or 'economically idle'." *Alexandre v. New York City Taxi & Limousine Com'n*, No. 07-cv-8175, 2007 WL 2826952, at *8 (S.D.N.Y. Sept. 28, 2007) (quoting *Lucas v. S.C. Costal Council*, 505 U.S. 1003, 1019, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992)).

"Anything less than a complete elimination of value, or a total loss," is a non-categorical taking, which is analyzed under the framework established in *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).  *See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 331, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002). The *Penn Central* analysis of a non-categorical taking "requires an intensive *ad hoc* inquiry into the circumstances of each particular case." *Buffalo Teachers,* 464 F.3d at 375.  Courts must "weigh three factors to determine whether the interference with property rises to the level of a taking: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Id.* (internal quotation marks omitted).

Because of the ad-hoc nature of regulatory takings analysis, facial challenges brought under the Takings Clause "face an uphill battle . . . made especially steep" when the parties seeking relief "have not claimed . . . that [government action] makes it commercially impracticable" for them to continue business operations on their property.  *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 495–96, 107 S. Ct. 1232, 1247, 94 L. Ed. 2d 472 (1987).  Such cases present "no concrete controversy concerning either application of the

[government action] to particular . . . operations or its effect on specific [property]." *Id.* at 495

(quoting *Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 295, 101 S.

Ct. 2352, 69 L. Ed. 2d 1 (1981)).  Therefore, the only issue properly before this Court is

"whether the mere enactment of the [Order] constitutes a taking." *Id.*

Applying the *Penn Central* factors to this case, the Court finds that Plaintiffs have not

shown that the Order inflicts "any deprivation significant enough to satisfy the heavy burden

placed upon one alleging a regulatory taking." *Keystone*, 480 U.S. at 493.  That conclusion is in

line with the Second Circuit's holding that regulations altering the landlord-tenant relationships

are "not susceptible to facial constitutional analysis under the Takings Clause." *W. 95 Hous.*, 31

F. App'x at 21.

       1. Economic Impact

The economic impact of EO 202.28 can only qualify as a regulatory taking if it

"effectively prevented [Plaintiffs] from making *any economic use* of [their] property." *Sherman*

*v. Town of Chester*, 752 F.3d 554, 565 (2d Cir. 2014) (emphasis added). To compare the value

that the property has lost with the value it held prior to the Order, the court must first determine

the "unit of property whose value is to furnish the denominator of the fraction." *Keystone*, 480

U.S. at 497.  For example, an ordinance prohibiting construction on the curtilage of a single-

family dwelling does not cause a regulatory taking, because courts focus "on the nature of the

interference with rights *in the parcel as a whole*," including the portions of the property not

subject to restrictions. *Id.* (quoting *Penn Central*, 438 U.S., at 130-31).

It is difficult to quantify the precise economic impact that the eviction moratorium and

security deposit provisions have had on Plaintiffs' property, because the Complaint contains only

two allegations relevant to the question and Plaintiffs elected not to introduce evidence in

support of their application.[5]  First, they argue that, "Each of the Plaintiffs is owed rents by

various tenants" – a statement that could just as easily encompass those tenants against whom an

eviction proceeding was initiated prior to pandemic as it could to those actually protected from

immediate eviction by the Order – and, second, that each landlord "has had [at] least one tenant

that has directed the tenant's security deposit be applied to rent arrears." (Compl. ¶¶ 29-

30.)  Like the vague allegation that the landlords are owed back rent by some of their tenants, the

security deposit allegations are insufficiently precise to support a finding that EO 202.28 has a

constitutionally significant economic impact -- not least because the Order decrees that, "Any

security deposit used as a payment of rent shall be replenished by the tenant or licensee."

Besides, even if an unspecified number of tenants are behind in their rental payments,

that is not enough for Plaintiffs to prevail on a facial challenge to the Order under the Takings

Clause.  Plaintiffs may not frame their takings claim by "narrowly defin[ing] certain segments of

their property [to] assert that . . . [EO 202.28] denies them economically viable use" of their

property. *Keystone*, 480 U.S. at 496.  In *Keystone*, the Supreme Court rejected a Takings Clause

challenge to a Pennsylvania law that prevented a mining company from extracting 2% of its coal

from the ground, reasoning that some 2% of the company's total raw materials, "do not

constitute a separate segment of property for takings law purposes." *Id.* at 498.  The same is true

for the subset of rental units currently occupied by tenants behind in their rent.  As was true in

*Keystone*, Plaintiffs provide no basis for treating the subset of their rented apartments occupied

by tenants facing financial hardship as a separate parcel; nor do they claim that EO 202.28 makes

it "commercially impracticable" for them to operate their buildings as a whole --  let alone every

---

[5] As noted above, plaintiffs originally moved for a preliminary injunction; the motion was converted to a motion for
a permanent injunction (i.e., a motion for summary judgment) after a conference with the court. In either instance,
the plaintiffs bore the burden to introduce such evidence as might be necessary to support their legal arguments. By
foregoing discovery the plaintiffs did not eliminate that burden.

building impacted by the Order, as they must to prevail on a facial challenge. *See id.* 495-498.  I note that the court specifically asked whether plaintiffs required discovery in order to bring/oppose a motion for summary judgment and was told that none was required.

      2.   Investment-backed expectations

      The second *Penn Central* factor is the extent to which EO 202.28 has interfered with Plaintiffs' "investment-backed expectations." "The purpose of the investment-backed expectation requirement is to limit recovery to owners who could demonstrate that they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime." *Allen v. Cuomo*, 100 F.3d 253, 262 (2d Cir. 1996).  To analyze the effect of the Order on Plaintiff's expectations, this Court must acknowledge that the Governor did not act on a blank slate, but, rather, made temporary adjustments to a statutory scheme that has governed landlord-tenant relations in the state for some time. As my colleague, the Hon. Richard Berman, reiterated, when denying a takings challenge to a rule requiring costly technological upgrades to New York City taxis, "[o]ne who chooses to engage in a publicly regulated business . . . by so doing surrenders his right to unfettered discretion as to how to conduct same." *Alexandre*, 2007 WL 2826952, at *8 (internal quotation marks omitted).

      Because landlords understand that the contractual right to collect rent is conditioned on compliance with a variety of state laws, their reasonable investment-backed expectations cannot extend to absolute freedom from "public program[s] adjusting the benefits and burdens of economic life to promote the common good." *Penn Central*, 438 U.S. at 124.  That is why numerous New York rent regulations have withstood Takings Clause challenges over the years, and why New York landlords do not enjoy a constitutional right to realize a profit from their rental properties – let alone all the profits contemplated in each of their individual rental

21

agreements.  *Park Avenue Tower Associates v. City of New York*, 746 F.2d 135, 140 (2d Cir.

1984), *cert. denied*, 470 U.S. 1087, 105 S.Ct. 1854, 85 L.Ed.2d 151 (1985). In *Park Avenue*, the

court upheld a zoning amendment limiting the height of commercial real estate towers, rejecting

the argument that the Takings Clause protects commercial landlords' right "to use . . . property in

a 'profitable' manner."  Because the property retained economically beneficial use to the current

owner as long as "others 'might be interested in purchasing all or part of the land' for permitted

uses," the court held that the height restriction did not qualify as a regulatory taking. *Id.* at 139

(quoting *Pompa Constr. Corp. v. Saratoga Springs*, 706 F.3d 418, 424 (2d Cir. 1983)).

    The decision in *Park Avenue* establishes that the particular profitability of a heavily

regulated property interest may fluctuate under a new regulation without that regulation affecting

a regulatory taking, provided that the state's action does not destroy the marketability of the

regulated property.  The record before this court contains no evidence that would allow me to

conclude that the plaintiffs' properties have become unmarketable by virtue of the order in suit.

    *Park Avenue* involved commercial real estate.  Twelve years later, the Circuit applied the

rule that a regulatory taking only occurs where government action affects total deprivation of

marketability to residential real estate.  In *FHMLC*, the Second Circuit rejected a takings

challenge to a provision of the New York City Rent Stabilization Law ("RSL") that imposed a

maximum allowable rent on three quarters of the apartments in a residential rental building.  *See*

*FHMLC*, 83 F.3d 45.  The court analyzed the plaintiff-landlord's expectations in light of the fact

that "FHLMC purchased an occupied building and acquiesced in its continued use as rental

housing." *Id.* at 48.  In *FHLMC*, as here, the challenged enactment still allowed landlords to "use

the[ir] property as previously planned," even though they "[would] not profit as much as . . .

under a market-based system." *Id.*  If a residential landlord continues to derive "economically

22

viable use" from his investments by "rent[ing] apartments and collect[ing] the regulated rents," he cannot establish a regulatory taking under the controlling precedents. *Id.*

Indeed, prior to EO 202.28, the state enacted New York Senate Bill S6458, the New York Housing Stability and Tenant Protection Act of 2019 ("HSTPA"), which doubled the length of a stay of eviction available to a tenant facing financial hardship from six months to one year. (*See* RPAPL § 753(1).)  It is telling that Plaintiffs did not challenge the HSTPA's adjustment to the stay period, even though it would, in some cases, result in eviction delays considerably longer than any that might be occasioned by the Order in suit.   That silence is consistent with what the Second Circuit has long held: the extent to which Plaintiffs' can realize a profit from their rental properties is not the relevant measure of their investment-backed expectations for the purposes of Takings Clause analysis.

Prior to the Order, millions of tenants in this state avoided ever-increasing rents, as well as the threat of immediate eviction, thanks to rules limiting a landlord's ability to extract the maximum value from their properties.  Plaintiffs knew that they operated as landlords under those rules. The Order's temporary adjustment of those rules, which does nothing more than defer the ability of the landlord to collect (or obtain a judgment for) the full amount of the rent the tenant freely agreed to pay, does not disrupt the landlords' investment-backed expectations.

3. The character of the governmental action

The nature of the Order also weighs against a finding that Plaintiffs have suffered a regulatory taking.  Relying in part on *FHLMC*, the Second Circuit explained in *Buffalo Teachers* that government actions possess the character of regulatory takings when they visit "affirmative exploitation" on affected parties, as opposed to "negative restrictions." *Buffalo Teachers*, 464

F.3d at 375.  There, the court ruled that a temporary wage freeze imposed to ensure a municipality's fiscal stability did not amount to a regulatory taking because "Nothing is affirmatively taken by the government" when a state action mandates nonpayment of a preexisting obligation. *Id.*  Although the Order may embody a policy decision to "take from Pete [the landlords] to pay Paul [the tenants] . . . such burden shifting does not, without more, amount to a regulatory taking." *Id.* at 376 (citing *Connolly*, 475 U.S. at 223 ("Given the propriety of the governmental power to regulate, it cannot be said that the Taking Clause is violated whenever legislation requires one person to use his or her assets for the benefit of another.")). And again, I must note that any reallocation of resources is purely temporary, since nothing in the Order diminishes the tenant's ultimate responsibility to pay the entire amount of rent due and owing under the lease, or to suffer judgment to be entered against him for that full amount plus interest.

*          *          *

Plaintiffs object to the Order because it "has foisted exclusively upon landlords the burden of rental issues." (*See* Dkt. No. 9, Lehrman Decl. ¶ 15.)  But the law in this Circuit is clear: state governments may, in times of emergency or otherwise, reallocate economic hardships between private parties, including landlords and their tenants, without violating the Takings Clause.  Plaintiffs' takings claim is dismissed.

## III.   EO 202.28 Does Not Violate Plaintiffs' Rights Under the Contracts Clause

Article I, Section 10 of the U.S. Constitution prohibits the states from passing any law "impairing the Obligation of Contracts."  U.S. Const. Art. I § 10, cl. 1.  "Although facially absolute, the Contracts Clause's prohibition 'is not the Draconian provision that its words might seem to imply' and does not trump the police power of a state to protect the general welfare of its citizens, a power which is 'paramount to any rights under contracts between individuals.' "

24

*Buffalo Teachers*, 464 F.3d at 367 (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 240, 98 S.Ct. 2716, L.Ed.2d 727 (1978)).

When deciding whether a state action affecting contracts is unconstitutional, courts in this Circuit ask: "(1) [whether] the contractual impairment [is] substantial and, if so, (2) [whether] the law serve[s] a legitimate public purpose such as remedying a general social or economic problem and, if such purpose is demonstrated, (3) [whether] the means chosen to accomplish this purpose [are] reasonable and necessary." *Sullivan v. Nassau Cty. Interim Fin. Auth.*, 959 F.3d 54 (2d Cir. 2020) (quoting *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 368 (2d Cir. 2006)).

When, as in this case, the challenged law only impairs private contracts, and not those to which the state is a party, courts "must accord substantial deference to the [State's] conclusion that its approach reasonably promotes the public purposes for which [it] was enacted." *Sal Tinnerello & Sons, Inc. v. Town of Stonington*, 141 F.3d 46, 54 (2d Cir. 1998) (citing *Energy Reserves Grp., Inc. v. Kan, Power & Light Co.*, 459 U.S. 400, 412-13, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983)). Accordingly, the law affords States a wide berth to infringe upon private contractual rights when they do so in the public interest rather than sel. *See U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 16, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977).

Because the Court concludes that neither of the challenged sections of the Order substantially impairs Plaintiffs' contract rights, it does not address the purpose of the Order, or the means that Governor Cuomo chose to pursue that purpose.

### A. The Security Deposit provisions do not substantially impair Plaintiffs' rights under the Contract Clause.

The first question when determining if a law violates the Contracts Clause is "whether the state law has 'operated as a substantial impairment of a contractual relationship.' " *Sveen v. Melin*, 138 S.Ct. 1815, 1821-22, 201 L.Ed. 2d 180 (2018) (quoting *Spannaus*, 438 U.S. at 244).

25

"In answering that question, the Court has considered the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Sveen*, 138 S.Ct. at 1822.

1.  Plaintiffs could not reasonable expect to be free of additional rental regulations.

The Second Circuit treats the aggrieved party's reasonable expectations as the touchstone of the analysis: "Impairment is greatest where the challenged government legislation was wholly unexpected." *Sanitation & Recycling Indus., Inc. v. City of New York ("Sanitation II")*, 107 F.3d 985, 993 (2d Cir. 1997). Similar to the "investment-backed expectation" prong of the *Penn Central* analysis, a long line of cases teaches that the foreseeability of an impairment on contractual rights, and therefore the extent to which such impairment qualifies as substantial, "is affected by whether the relevant party operates in a heavily regulated industry." *Sullivan*, 959 F.3d at 64 (citing *Sanitation II*, 107 F.3d at 993); *see also Veix v. Sixth Ward Bldg. & Loan Ass'n*, 310 U.S. 32, 38, 60 S.Ct. 792, 84 L.Ed. 1061 (1940). For those who do business in a heavily regulated industry, "the expected costs of foreseeable future regulation are already presumed to be priced into the contracts formed under the prior regulation." *All. of Auto. Mfrs., Inc. v. Currey ("AAM")*, 984 F. Supp. 2d 32, 55 (D. Conn. 2013), *aff'd*, 610 F. App'x 10 (2d Cir. 2015).

Because past regulation puts industry participants on notice that they may face further government intervention in the future, a later-in-time regulation is less likely to violate the contracts clause where it "covers the same topic [as the prior regulation] and shares the same overt legislative intent to the protect [the parties protected by the prior regulation]." *AAM*, 984 F. Supp. 2d at 55.  Again, there is no question that residential leases are subject to a number of regulations that do not implicate the Contracts Clause. For example, "It is well established that

[New York] City's rent control laws do not unconstitutionally impair contract rights." *Brontel, Ltd. v. City of N.Y.*, 571 F. Supp. 1065, 1072 (S.D.N.Y. 1983) (citing *Marcus Brown Holding Co. v. Feldman*, 256 U.S. 170, 198, 41 S.Ct. 465, 65 L.Ed. 877 (1921)). Therefore, EO 202.28 -- which modifies aspects of the statutory scheme relating to permissible uses of security deposits -- should have come as a no surprise to the landlord Plaintiffs, and thus could not amount to a substantial impairment of their rights under their rental agreements.

Furthermore, the foreseeability of additional regulation allows states to interfere with both past and future contracts. The landlords may not limit application of the Order to agreements they have yet to negotiate and execute; the Contracts Clause also permits states to modify and abrogate existing contract terms long since agreed to and performed by the parties. For example, in *Buffalo Teachers*, the Second Circuit upheld a wage freeze that prohibited payment of a 2% raise the plaintiff unions had previously negotiated with the city government. *Buffalo Teachers*, 464 F.3d at 367.   And in *Tinnerello*, the court permitted a Connecticut town to invalidate seventy of the plaintiff's existing commercial waste contracts "in order to provide a safe and efficient disposal operation." *Tinnerello*, 141 F.3d at 54.

EO 202.28 also protects the same parties as those protected by General Obligations Laws temporarily displaced during the emergency. Security deposits are, by law, the property of the tenant, not the landlord. N.Y. Gen. Oblig. L. § 7-103. The preexisting security deposit regime ensured the landlord access to deposit funds "as security for performance of the contract or to be applied to payments upon such contract when due," while allowing the tenant to earn interest on the deposit funds during the period of the rental. N.Y. Gen. Oblig. L. § 7-101. So, the statutory scheme to which the Plaintiffs hope to return allows the same flow of deposit funds that the Order now mandates: deposits are "applied to payments," *i.e.*, collected by landlords, while

27

renters experiencing financial hardship are able to rely on their security deposits to avoid falling behind in their rent. The Order also preserves the Plaintiffs' pre-emergency status quo, by ensuring that "Any security deposit used as a payment of rent shall be replenished by the tenant or licensee" within 90 days. Indeed, the Order provides even more protection for the landlord Plaintiffs than they enjoyed prior to the emergency, because they are also temporarily protected from foreclosure of their properties to the extent that their properties are is subject to a mortgage, which the landlords may have difficulty paying if tenants are defaulting on their rent.

2. EO 202.28 sufficiently safeguards Plaintiffs' ability to realize the benefit of their bargain.

The security deposit provisions allow the landlords to collect deposit funds in lieu of their tenants' missed rental payments, without waiving their right to collect "the remaining rent due and owing for that month" at a later time. For that reason, the other two aspects of a "substantial impairment" enumerated in *Sveen* -- the extent to which an impairment undermines the contractual bargain, and the ability of the impaired party to safeguard or reinstate their rights at a later time -- weigh against finding a substantial impairment arising from the security deposit provisions.

At bottom, provisions ensure that landlords will be made whole while their tenants are facing extraordinary financial hardships. As a court in this district once held, regulations that "reimburs[e] landlords for lost rental income" do not impose a substantial impairment on those parties' contract rights. *Kraebel v. New York City Dep't of Hous. Pres. & Dev.*, No. 90-cv-4391 (MJL), 1991 WL 84598, at *5 (S.D.N.Y. May 13, 1991), *aff'd in part, rev'd on other grounds,* 959 F.2d 395 (2d Cir. 1992). In *Kraebel*, the court dismissed a challenge to a program exempting senior citizens from paying rent increases, while reimbursing landlords through tax abatements and cash payments. The Court reasoned that, because the landlords were operating

"in such a pervasively regulated area" and the program " seeks on its face only to *fulfill*

landlords' contractual expectations," the claim under the Contracts Clause failed as a matter of

law. *Id.*  So to here.

Furthermore, the Order does not displace the civil remedies always available to landlords

seeking to recover the costs of repairs or unpaid rents still owed at the end of a lease term. The

security deposit is held as security for repairs the landlord might be required to make at the end

of a tenancy. If the tenant uses the security deposit to pay a month's rent, and the tenancy ends

before the deposit is fully replenished, the landlord can obtain a judgment for the amount

expended in repairs. The whole scheme is no different than what actually happens in the real

world, where tenants routinely forfeit their security deposit by allowing it to "cover the last

month's rent" on a lease. And I again emphasize that nothing in the Order diminishes the

tenant's rental obligation by even a nickel. The landlord can collect all he is owed at the end of

the day by the simple expedient of going to some court when the courts are fully reopened. The

fact that landlords would prefer not to avail themselves of their legal remedies – because it is

often not worth the trouble to pursue a deadbeat tenant – does not mean that the state has

impaired their contractual rights .

Because the security deposit provisions do not prevent Plaintiffs from "safeguarding or

reinstating [their rights]," *Sveen*, 138 S.Ct. at 1822, as soon as the Order expires, they do not

impose a substantial impairment on Plaintiffs' contractual rights.

### B.  The eviction moratorium in EO 202.28 does not violate the Contracts Clause.

Plaintiffs also claim that the Order impairs an implied term of their rental agreements: the

landlords' right to use legal process to evict their tenants.  At argument, Plaintiffs impressed

upon the Court that eviction proceedings are critical tools for bringing the parties together to

resolve nonpayment disputes. Plaintiffs argue that by pausing evictions and removing the landlords' enforcement mechanism, the Governor is encouraging tenants to shirk their obligations to pay rent, and thus "dictating the result" of potential evictions in favor of tenants who are in arrears. (Dkt. No. 27, at 3.)

On the present record, it is not clear whether the rental agreements between plaintiffs and their tenants expressly provide the landlords with contractual rights to pursue evictions. Plaintiffs have represented that the default clauses in each agreement allow the landlords to seek relief under state law, but that does not settle whether the right is express or implied. It is generally true that "the laws which subsist at the time and place of the making of a contract . . . enter into and become a part of it." *Home Building & Loan Assn. v. Blaisdell*, 290 U.S. 398, 429-30, 54 S.Ct. 231, 78 L.Ed. 413 (1934.) However, the implied contractual rights conferred by state laws, including judicial remedies such as eviction, may be the subject of a Contracts Clause claim "only when those laws affect the validity, construction, and enforcement of contracts." *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 189, 112 S.Ct. 1105, 117 L.Ed.2d 328 (1992).

The Court (which has seen more than its fair share of leases over the course of a 40+ year career in the law) will assume, *arguendo*, that the default provisions of the various rental agreements indicate that eviction proceedings are essential to "enforcement" of their rental agreements—and indeed, that the leases between Plaintiffs and their tenants contain standard provisions about the landlord's remedies in case of non-payment of rent, which specifically refer to RPAPL 711(2) – a remedy created by statute and not by contract --  in the event of non-payment.

Proving a violation of the Contracts Clause based on implied rights is difficult, especially when the party retains the opportunity to vindicate those rights by some other avenue. As the

Supreme Court has noted, "a reasonable modification of statutes governing contract remedies is much less likely to upset expectations than a law adjusting the express terms of an agreement." *U.S. Trust*, 431 U.S. at 19 n.17. The Supreme Court reiterated the point in *Sveen* when it held that a measure altering available remedies without nullifying them neither undermines the contractual bargain or "prevents the party from safeguarding or reinstating [their] rights." *Sveen*, 138 S.Ct. at 1822.

The eviction moratorium does not eliminate the suite of contractual remedies available to the Plaintiffs; it merely postpones the date on which landlords may commence summary proceedings against their tenants. The tenants are still bound to their contracts, and the landlord may obtain a judgment for unpaid rent if the tenants fail to honor their obligations. Furthemore, on August 20, this Court is sure that Plaintiffs and others similarly situated will exercise their rights to commence eviction proceedings to make up for lost time. That being so, the implied right to such legal process has not been impaired by the Order. *See Eric M. Berman, P.C. v. City of New York*, 895 F. Supp. 2d 453, 499 (E.D.N.Y. 2012) ("'Impairment' occurs when the law prohibits performance of an obligation and extinguishes available remedies for nonperformance.") (citing *Blaisdell,* 290 U.S. at 431 ("The obligations of a contract are impaired by a law which renders them invalid, or releases or extinguishes them.")).

Plaintiffs' claims under the Contract Clause fail as a matter of law. Defendant's cross motion for summary judgment on this claim is granted.

## IV.   EO 202.28 Does Not Violate Plaintiffs' Rights Under the Due Process Clause.

Plaintiffs' failure to demonstrate substantial impairment of their property rights is fatal to their procedural due process claim, too.

"To succeed on a procedural due process claim, 'a plaintiff must first identify a property right, second show that the state has deprived him [or her] of *that* right, and third show that the deprivation was effected without due process.'" *Progressive Credit Union v. City of New York*, 889 F.3d 40, 51 (2d Cir. 2018) (quoting *Local 342, Long Island Pub. Serv. Emps., UMD, ILA, AFL-CIO v. Town Bd. of Huntington*, 31 F.3d 1191, 1194 (2d Cir. 1994) (internal quotation marks omitted)).

To begin with, Plaintiffs have not identified a property interest independent of the interests addressed by their other constitutional claims.  That is fatal to their due process claim.  The Second Circuit has expressly forbidden this sort of duplication, because the Due Process Clause cannot be called upon to safeguard a right, "Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior."  *Harmon*, 412 Fed. Appx. at 423 (quoting *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, 560 U.S. 701, 721, 130 S.Ct. 2592, 177 L.Ed.2d 184 (2010)).

Nor have the Plaintiffs shown a deprivation of those interests.  As in the takings context, the Second Circuit requires something more than proof that a party's property has suffered "a decrease in . . . value" to prevail on a procedural due process claim.  *Progressive*, 889 F.3d at 52.  But all that Plaintiffs complain of is the potential that they will have to wait before pursuing the remedies otherwise available to them. Therefore, EO 202.28 does not deprive Plaintiffs' of their property rights.

For the same reason, Plaintiffs also fail to show a denial of due process.  "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldredge*, 424 U.S. 319, 334, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).  There is no question that, as to manner, Plaintiffs will be able to initiate new

proceedings in the same forum and manner that they always have, after August 19.  And as for

Plaintiff's claim that "the Order precludes [them] from being heard at *any* time" (Pl.'s Br. at 13.),

that is wrong for two reasons.  First, they can still initiate eviction proceedings against the

tenants who are not facing financial hardship but who have chosen not to pay their rent.  And,

second, they will be able to move against their other tenants after August 19. No case says that "a

meaningful time" means as soon as a cause of action accrues – especially where, as in New

York, the filing of a summary proceeding is but the first step in what often takes years to

accomplish, which is the ultimate eviction of a tenant. Therefore, the delay embodied mandated

by the Order does not deny the Plaintiffs a meaningful opportunity to be heard.

>    Plaintiffs' Due Process claim fails as a matter of law.

## V.    EO 202.28 Does Not Violate Plaintiffs' Rights Under the Petition Clause.

>    Finally, Plaintiffs argue that EO 202.28 denies them their constitutional rights to petition

the government, because they can no longer file summary proceedings for nonpayment of rent,

or for their tenants' failure to replenish their security.  This claim is meritless.

>    The right to petition for a redress of grievances in the form of judicial relief is protected

by the First Amendment.  *See, e.g.*, *Gagliardi v. Village of Pawling*¸18 F.3d 188, 194 (2d Cir.

1994) (citing *United Mine Workers v. Ill. Bar Assoc.*, 389 U.S. 217, 222, 88 S.Ct. 353, 19

L.Ed.2d 426 (1967)).  The right of access to courts is burdened when state officials take systemic

action to frustrate a plaintiff or class of plaintiffs from preparing and filing lawsuits.  *Christopher*

*v. Harbury*, 536 U.S. 403, 413, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002).  To prevail on a denial

of access claim, the plaintiff must show "that the defendant took or was responsible for actions

that hindered [a plaintiff's] efforts to pursue a legal claim," *Davis v. Goord*, 320 F.3d 346, 351

(2d Cir. 2003); (quoting *Lewis v. Casey,* 518 U.S. 343, 349, 351, 116 S.Ct. 2174, 135 L.Ed.2d

606 (1996) (alteration in original)).  "As the Supreme Court has explained, the requirement of

actual injury 'derives ultimately from the doctrine of standing.'" *Monsky v. Moraghan*, 127 F.3d

243, 247 (2d Cir. 1997) (quoting *Lewis*, 518 U.S. at 349)).

Plaintiffs have not shown that the eviction moratorium EO 202.28 "had the actual effect

of frustrating the [their] effort[s] to pursue a legal claim." *Oliva v. Town of Greece*, 630 Fed.

Appx. 43, 45 (2d Cir. 2015). Although nonpayment proceedings have been suspended, Plaintiffs

can still sue their tenants for arrearages through a breach of contract action in the New York

Supreme Court – and the fact that is not their preferred remedy is of no moment.  They will also

have the opportunity to bring eviction proceedings for reason of nonpayment once the order

expires, a right preserved by the portion of EO 202.28 that extends relevant statutes of limitation

for the duration of court closures.  Since "mere delay" to filing a lawsuit cannot form the basis of

a Petition Clause violation when the plaintiff will, at some point, regain access to legal process,

*Davis*, 320 F.3d at 352, the Plaintiffs' right to collect both the monetary remedies and injunctive

relief they would seek through an eviction proceeding has not been "completely foreclosed" by

EO 202.28, *Sousa v. Marquez*, 702 F.3d 124, 125 (2d Cir. 2012). The eviction moratorium in EO

202.28 does not violate Plaintiffs' First Amendment rights.

At the hearing, Plaintiffs argued that the security deposit provisions caused a distinct,

and irreparable, denial of access: because EO 202.28 allows the tenant to replenish the funds

applied to rent due and owing on an incremental basis, the Order does not guarantee that the

deposit will be made whole before the tenant vacates the premises, thus potentially leaving

Plaintiffs to foot the bill for any necessary repairs to the unit. Normally, the failure to replenish

the security deposit would be the proper subject of a holdover proceeding.  Plaintiffs claim that

the suspension of all petitions in state Civil Courts – including holdover proceedings for all

reasons other than nonpayment – denies them the possibility of a remedy against tenants who have failed to maintain necessary deposit funds in escrow.

It is not the case that Plaintiffs will some day have no way to hale their tenants into court for failing to replenish their security deposits – it is merely the case that it will generally not be worth a landlord's while to do so. But even if Plaintiffs were correct, Governor Cuomo is not to blame for the Plaintiff's lack of access to holdover proceedings for reasons other than nonpayment. EO 202.28 only applies to evictions "for nonpayment." It is the order of the Chief Administrative Judge that suspends all eviction proceedings in Civil Courts, "whether brought on the ground that respondent has defaulted in the payment of rent *or on some other ground.*" (AO at 1 (emphasis added).) Therefore, Governor Cuomo is not responsible for the injury for which Plaintiffs seek a cure, because striking his Order would not grant the Plaintiffs access to the Civil Courts to file holdover proceedings for reasons other than nonpayment.

Be that as it may, Plaintiffs argue that this Court should strike the Order under the Petition Clause because "the issues on this motion . . . are similar to those raised" in *ACA International v. Healey,* No. 20-cv-10767, 2020 WL 2198366 (D. Mass. May 6, 2020). (Pl.'s Br. at 4.) The plaintiff in *ACA*, a trade association representing the credit-and-collection industry, attacked the constitutionality of an emergency regulation issued by the Massachusetts Attorney General in response to the COVID-19 pandemic. *Id.* at *1. Through the new regulation, the Attorney General used her authority to interpret the state's consumer protection statutes to define the initiation, filing, or threat to file "any new collection lawsuit" as an unfair or deceptive act subject to civil liability. *Id.* at *1-2 (citing Mass. Gen. Laws ch. 93A § 2). The court found that the plaintiff had demonstrated a likelihood of success on the merits of their Petition Clause claim, explaining that the regulation exceeded the sort of "mere procedural obstacles"

permissible under the Petition Clause since it precluded the plaintiff's members from obtaining any "relief . . . through authorized judicial proceedings." *Id.* at *9 (quoting *Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934)).

EO 202.28 is not nearly as broad as the regulation struck down in *ACA*.  In that case, the attorney general effectively outlawed legal remedies of any kind in any court, state or federal, for a whole class of creditors, debt buyers, and collections agencies.  By contrast, Governor Cuomo's Order suspended one of several avenues by which landlords can seek relief for nonpayment, while leaving other (if less favored) remedial proceedings for breach of contract (which is exactly what a breach of a lease is) in place. That most of New York's courts suspended their operations during the pandemic, thereby incidentally burdening other rights not addressed by EO 202.28, does not mean that the Order forecloses Plaintiffs from petitioning the government.  To rule otherwise would greatly exaggerate the actual effects of a temporary pause on a subset of evictions, which nevertheless preserved the landlords' economic rights under the affected rental agreements, and which was tailored to avoid crowding in housing courts and homeless shelters during an ongoing public health emergency.

Accordingly, Governor Cuomo is entitled to summary judgment on Plaintiffs' claim that EO 202.28 violates the Petition Clause of the First Amendment.

## CONCLUSION

Plaintiffs' motion for summary judgment is DENIED in full.

Defendant's motion for summary judgment is GRANTED in full.

The Clerk of Court is directed to close the motion at Docket Number 7, and close this case.

Dated: June 29, 2020

_____
Colleen McMahon
Chief Judge